Adolph C. BURGER, also known as A. C. Burger and Andy Burger, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16000.

United States Court of Appeals Eighth Circuit.

Feb. 2, 1959.

Rehearing Denied Feb. 26, 1959.

Don O. Russell, St. Louis, Mo. (William A. Ens, St. Louis, Mo., was with him on the brief), for appellant.

Murry L. Randall, Asst. U. S. Atty., St. Louis, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., and W. Francis Murrell, Asst. U. S. Atty., Jefferson City, Mo., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

Adolph C. Burger and Carlisle Cooper were indicted on December 18, 1953, in two counts for wilfully and knowingly attempting to defeat and evade a large part of the taxes due and owing by Andy Burger Motors, Inc., a corporation, for the fiscal years ending June 30, 1947, and June 30, 1948, respectively, by filing false and fraudulent tax returns of the corporation for those years, all in violation of 26 U.S.C. § 145(b), Internal Revenue Code, 1939. The indictment charged that the net income returned by the corporation for the first period was $472,-672.26, whereas it was $614,744.59, and that the tax returned was $179,615.46 and it was $233,602.94; that the net income returned for the second period was $312,636.82, whereas it was $351,607.19, and that the tax returned was $118,-334.38, whereas it was $133,143.07.

Prior to the trial the indictment was dismissed as to defendant Cooper who was called to testify by the government. Defendant Burger had a jury trial on his plea of not guilty, was convicted on both counts of the indictment, and sentenced to four years imprisonment. He appeals.

There was substantial evidence from which it could be fairly inferred that:

Andy Burger Motors, Inc., was incorporated on July 1, 1946, and at all relevant times was engaged in the business of selling and servicing automobiles. Its capital stock belonged to defendant Burger and his wife; one share was issued to Carlisle Cooper, but it was endorsed back

to Burger. Burger was president and closely supervised and controlled the operation of the corporation business. Acting for the corporation, he employed Carlisle Cooper as its general manager in charge of sales and service at its plant on South Grand Street in St. Louis, and Munson Raymond Crocker as its general manager of Community Motors, operated as part of the capital structure of Andy Burger Motors, Inc., for the first four months of the indictment period, on Natural Bridge Avenue in that city. Cooper also became vice president of the corporation though he had no financial interest in it. Both Cooper and Crocker worked a long time under Burger in the enterprises he controlled. Crocker was so employed some twenty-four years and Cooper at least eight.

Late in 1945 and early in 1946, when OPA ceiling regulations were in effect, Cooper was employed in an automobile sales and service business controlled by Burger. Sometime during that period Burger discussed with Cooper the practice of making out false invoices to evidence the sale of cars, and of falsifying the entries in the corporation's books that were derived from the invoices, by showing smaller prices for the cars sold than were actually obtained for them from the purchasers on the sale. It was said that others were doing it and Burger instructed Cooper to follow the practice in their business and agreed that Cooper would be paid ten per cent of the excess money so obtained over the false price stated in the invoice. Burger instructed Cooper to deliver the money received from sales of cars in excess of the price stated in the invoice to him and to keep an account of the sales made on that basis so that Burger " * * * would know what the transactions were and what they covered". The books of the corporation based the amounts of its receipts from the sales of cars upon the amounts stated in the invoices, so that the false invoices produced false amounts, shown as received, from sales of cars on the corporation books.

Pursuant to Burger's instructions, Cooper made sales of cars and issued false invoices which were delivered to the purchasers and to the corporation bookkeeper showing the sale price to be less than the money obtained on the sale. The OPA ceiling prices were removed in November, 1946, some four months after the incorporation of the Andy Burger Motors, Inc., and thereafter Burger directed Cooper to continue the practice of making sales at prices above the prices stated in the sales invoices. He told Cooper: "It was the way we set up our books and if we change now we will disclose what we have done before". The selling of cars by the corporation at prices in excess of the prices shown on the false invoices was accordingly continued consistently throughout the two year indictment period. The amounts of the payments that were in excess of the amounts shown on the invoices were always collected in cash money. Cooper was provided with small books containing perforated detachable sheets arranged so that the entries made on a page of the book would be copied with carbon onto the next sheet. In the regular course of sales made at prices above invoice prices, Cooper would enter a memorandum of the real transaction in the small book, sufficient to identify it with the corresponding corporation stock number and sale records and also the amount of cash money in excess of the invoice price received from the sale. He made these entries at the time of the transactions, in his office at the place of business of Andy Burger Motors, Inc., and in many cases in the presence of the purchasers, some of whom swore to seeing him do it. The entries fill nearly eleven books. They show cash received over the false invoice price during the two indictment years on 941 cars; such cash overage received during the first year amounting to $161,602.69 and during the second year to $60,651.00—both amounts being greater than the amounts of insufficiency in the tax returns of the cor-

poration for the respective years covered in the indictment.

In obedience to Burger's instructions, Cooper turned over to Burger all of the money received on account of excess charged for the cars over the invoice price. Burger then paid him ten per cent of such money as he had agreed to do. With the delivery of the cash to Burger, Cooper detached from the books and delivered the original entries, which contained the account of the sales producing the money, to Burger in compliance with Burger's request. Cooper retained the copy sheets in the books in his own possession. They were identified and the entries therein were fully explained by Cooper on the witness stand. They were received in evidence and are included by reference in the record here.

Munson Raymond Crocker was general manager of another automobile sales and service agency, called Community Motors Company, which was part of and operated within the capital structure of Andy Burger Motors under the supervision and control of defendant Burger. Crocker received the same directions from Burger as Cooper had received; to follow the practice of charging an additional cash amount over a false invoice price in the sale of cars. The direction was given in late 1945 or early 1946 and the practice was followed under Crocker's management until the Community Motors Company was taken out of the capital structure of Andy Burger Motors, Inc., in November, 1946. Crocker continued the practice until 1948. The agreement between Burger and Crocker was that Crocker should be paid ten per cent of the excess cash received over invoice price of cars sold and Crocker was to give the remaining ninety per cent to Burger. Copies of the false invoices were turned over to the bookkeeper and the books were kept in accord with them. Crocker did not keep a record of the sales made under his management or the cash received from them in that manner. He had been longer in responsible employment under Burger than Cooper and Burger did not require him to keep account of the excess moneys he received. He was constrained to testify from memory. Crocker accounted to Burger from time to time throughout the indictment period for all the cash received on the sale of cars above the invoice price and paid over ninety per cent of it to Burger and kept ten per cent. He swore that to the best of his recollection about 75 per cent of the corporation's new cars sold under his management had "trade-ins", and that cash over and above invoice price was obtained on the sale of about seventy-five per cent of the used cars. The estimates given by Crocker on the witness stand and the estimates of customers, who had bought from the agency under his management in accordance with the described practice, established that large amounts of cash consideration for cars were not disclosed by the corporation's books, or invoices, or included in the corporation income tax returns, but were effectually concealed.

In consequence of the practice carried on under Burger's directions, the tax returns of Andy Burger Motors, Inc., were made up in each of the indictment years from the false invoices and wrongfully omitted that portion of the price that was received over invoice prices.

Each of those tax returns was signed and filed by defendant Burger, president of the corporation.

Carlisle Cooper, Munson Raymond Crocker, and defendant Burger were questioned by Internal Revenue agents concerning the practice of falsifying the invoices and the corporate books and the tax returns. They made denials of having engaged in the practice and made detailed statements exculpating themselves. Cooper and Crocker were prosecuted in federal court for their perjury.

Cooper plead not guilty and stood trial. Burger's attorney was employed to defend him and Cooper was given to understand that Burger would take care of the attorney's fee, which he did. A transcript of the proceedings was delivered daily to their attorney during the trial of Cooper, and Burger and Cooper had

conversations in which the thought was mutually expressed that the government had not produced any evidence in court and they felt they had a good chance of winning.

Cooper was convicted and his conviction was affirmed on appeal. Cooper v. United States, 8 Cir., 233 F.2d 821. He was subjected to imprisonment. Thereupon Burger agreed to see that Cooper's wife "got along while he was gone". He also provided a salary of $550 a month for Cooper during his imprisonment and as soon as that ended he took Cooper back in the employment of Andy Burger Motors, Inc., at a thousand dollars a month. Cooper gave Burger some promissory notes signed in blank and also a deed of trust on his home in connection with the large sums of money Burger advanced for him after his arrest, but Cooper was never called on to make any payment on the notes. Cooper was under fidelity bond to the corporation in the sum of $25,000, but Burger brought no action to recover on that bond.

Crocker did not stand trial, but plead guilty to the false swearing, in the matter of the false invoices and concealment of consideration received for cars sold, before the Internal Revenue agents and was sent to prison. While there, Burger caused him to be paid $550 a month, and after his prison term expired took him back into his employ at a thousand dollars a month. Crocker also was under fidelity bond to the corporation which was never sued on.

Neither Cooper, nor Crocker, nor Burger included any amounts in their tax returns for the indictment years on account of the amounts received during the period as consideration for the cars sold for more than invoice prices. But Cooper and Crocker have since signed waivers for the government and investigation of the amounts of tax chargeable against them for the period was being made at the time of this trial.

A great many of the corporation's sales of cars for amounts above the prices shown on false invoices were made to dealers who resold the cars. All of such dealers confirmed that they had bought cars from the corporation and the companies included in its capital structure on that basis during the indictment years.

One of such dealers was Montgomery Motor Sales which bought several hundred cars in that way from Andy Burger Motors, Inc., and its agencies during the period. Three of the Montgomery officials so testified. Elbert Montgomery also explained that his company followed the same plan of issuing its invoices to its purchasers showing certain prices received and keeping its books in accord with such invoices, but actually receiving and collecting cash additional to that price not shown by the books. During the original investigation of Andy Burger Motors, Inc., by the Internal Revenue officers Cooper felt unsure about what the entries in Montgomery's books might show as to such sales made to it. The Montgomery Company had not originally been a customer of his and he had come to deal with them only after discussing them with Burger who had known them previously. After conferring with Burger, Cooper went to the Montgomery place of business and checked their books and found they did not record the cash paid by them for cars bought from Andy Burger Motors, Inc., in addition to the prices shown on their sale invoices. Cooper then took Elbert Montgomery to see Burger. They met him in a certain alley adjacent to Burger's so-called A.B.C. store in St. Louis. Cooper did not stay with them during their interview. He merely stated to Burger at the outset that Montgomery had not signed anything for the Internal Revenue agents who had been to see him and walked away and did not hear what they said. Their interview lasted ten or fifteen minutes. Montgomery swore it was merely a friendly argument about whether the Cadillac he was driving, or the Lincoln Burger drove, was the better car. Nothing else. Burger testified (somewhat contradicting his testimony elsewhere that he "did no selling of cars") that he only "wanted to see Montgomery about selling him some Lincoln cars  *  *  * ".

The defendant Burger testified at length in his own behalf. He denied giving any instructions to Cooper or to Crocker to make sales of corporation cars at prices over the invoice prices and declared that he had no knowledge, at the time of signing the Andy Burger Motors, Inc., tax return, of any sales being made on that basis under the management of either of them. He had been inquired of by Internal Revenue agents and had made the denials to them. He declared that neither Cooper nor Crocker had ever delivered to him any money obtained in that manner and that he had never seen the record of sales made at over invoice prices in the books kept by Cooper until copies were shown to him shortly before the trial of this case. He made inquiry of the corporation's "various personnel", including Cooper and Crocker, but "was unable to find any evidence that any sales had been made in that way". He "opened all the books and records of Andy Burger Motors, Inc., to investigating Internal Revenue officers". He first came to the belief that Cooper and Crocker had made sales and received money on them, in excess of invoice prices, after Cooper's trial on the perjury charges against him, and after Crocker had plead guilty to the charges against him.

At the close of all the evidence motion for directed verdict in defendant's favor was presented and denied.

Appellant contends for reversal that the court erred: (1) in failing to find that the first count of the indictment was barred by the Statute of Limitations; (2) (a) in receiving the evidence of Cooper and Crocker who had been convicted of perjury and made false invoices; (b) in receiving the books of account maintained by Cooper; (c) in receiving the evidence of transactions prior and subsequent to the indictment period; (d) in receiving estimates of certain witnesses of overage cash amounts claimed to have been paid by purchasers of cars; (3) in giving and failing to give certain instructions; (4) in making prejudicial remarks in the presence of the jury; and

(5) in denying defendant's motion at the close of the evidence for acquittal for insufficiency of evidence.

## I.

The indictment alleged that the offense occurred on September 11, 1947, which was the day the defendant caused the corporation's tax return to be filed. A complaint charging the defendant Burger with having committed the same offense alleged against him in the indictment herein was filed with the proper United States Commissioner on September 9th, 1953, and a warrant was issued thereon and served on defendant, who waived hearing and was released on bond. The Statute of Limitations was six years as provided in Title 26 U.S.C. § 3748 (1939), but the same section extends that period, where a complaint charging the offense has been filed, until the discharge of the grand jury at the next session within the district. Zacher v. United States, 8 Cir., 227 F.2d 219, 224–225.

The indictment herein was returned on December 18, 1953, by the same grand jury which was in session at the time the complaint was filed. Although the action of the Commissioner before whom the complaint was filed was duly transmitted to the clerk of the district court, it became misfiled in another file of a case entitled United States v. Burger. During the trial of this case Burger attacked the sufficiency of the complaint filed with the Commissioner to toll the statute beyond the six years on the ground that the complaint did not charge the same offense against him as is set forth in the indictment. The court properly denied the motion. The point was without merit and has not been argued here. A point is made here however that the statute was not tolled because of the misfiling which occurred in the clerk's office. It is equally without merit. No prejudice of any kind was occasioned defendant by the misfiling. The statute was satisfied by the transmittal of the record to the clerk's office where it was available to defendant and as stated, it was used by defendant on his trial.

■ In addition, since appellant was given concurrent sentences, the second count is sufficient to sustain the judgment appealed from. Hulahan v. United States, 8 Cir., 214 F.2d 441, 442 and cases cited there; Schumacher v. United States, 8 Cir., 216 F.2d 780, 783.

## II.

■ (a) There was no error in receiving the testimony of defendant's long time associates in business, Cooper and Crocker, on account of their having sworn falsely (as they admitted) in favor of themselves and the defendant to the revenue agents. Their credibility was solely for the jury. Dean v. United States, 8 Cir., 246 F.2d 335, 336; United States v. Reina, 2 Cir., 242 F.2d 302, 307.

■ The fact that they were accomplices with defendant in his attempt to evade taxes presented no reason to exclude their testimony. "It has been held over and over again that in the federal jurisprudence a conviction may depend upon the uncorroborated testimony of an accomplice." United States v. Reina, supra, 242 F.2d at page 307;[1] Haakinson v. United States, 8 Cir., 238 F.2d 775, 779, and cases cited there.

■ (b) The books in which Cooper kept accounts of a class of sales of corporation cars made under his management were properly received in evidence. They were kept by the general manager at the direction of the president of the corporation and the entries were made at the place of the business, at the time of the transaction, and in the regular course of the business transacted. The indictment years begin with the last page of the first book and, as stated by the prosecution without dispute, they show cash overages during the indictment years on some 941 cars. A count shows that on 805 of those cars, mostly used cars, the books show the date, name of purchaser, Andy Burger Motors, Inc. stock number, invoice price and cash overage. On 136 new cars the books only show one figure, one or two names, and date. Cooper testified that in such cases the name was either the purchaser's or an intermediary who paid him the cash or both and that the figure represents the cash. On 80 of these 136 cars the books also contain the word "over" or "overage". The accountant was able, from the books alone, to tie in all but 26 of the cars with the records of Andy Burger Motors, Inc. Cooper testified that 5 of the these 26 were sold by him for another Burger business, Burger's father, and a Burger employee. The cars which the accountant found in the invoices of Andy Burger Motors, Inc., are listed, with information from the invoices, in the order in which they appear on the Cooper records and in the record of exhibits. They were clearly books kept in the ordinary course of business for business purposes. Smith v. United States, 8 Cir., 236 F.2d 260, 265, certiorari denied 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118; United States v. Brewster, 2 Cir., 231 F.2d 213, 214; Bodnar v. United States, 6 Cir., 248 F.2d 481, 482; Leathers v. United States, 9 Cir., 250 F.2d 159, 160–162; United States v. Mortimer, 2 Cir., 118 F.2d 266, 270, certiorari denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496; McFee v. United States, 9 Cir., 53 F.2d 553, 554, certiorari denied 285 U.S. 546, 52 S.Ct. 395, 76 L.Ed. 938. Moreover, as they were made by Cooper at the request of the defendant Burger, they were also admissible for that reason; and Cooper who made them could explain them. McFee v. United States, supra, 53 F.2d at page 553—further, they were admissible because Burger was given a copy of them. As this Court stated in Smith v. United States, supra, 236 F.2d at page 266: "The admissibility of records and entries made in the regular course of business is today unquestioned. United States v. Mortimer, 2 Cir., 118 F.2d 226, certiorari denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496. This is especially true in United States courts. 28 U.S.C.A. § 1732." There was no error in receiving them in evidence.

1. There are exceptions shown in the text cited but they are not relevant here.

(c) The point that the court erred in receiving evidence concerning the beginnings of defendant's practice of falsifying the corporation's records of amounts received from its sales of cars before the indictment period is without merit. The government did not go into the figures or amounts prior to the indictment period, but it was proper and necessary to an understanding of the case to show that the charged attempt to evade tax was not an isolated act, but that defendant's intent was to evade by means of a practice or course of conduct. There is some argument for defendant that it was begun only to avoid OPA ceilings, which would be irrelevant if the intent to evade was also present. The court was not in error in receiving the evidence of Burger's instructions at the beginning of the practice and following it up by taking and concealing the income during the indictment period. No testimony as to his conduct prior to the offense was received that did not tend to prove his intent to defeat and evade the corporation's tax as charged in the indictment. See Inholte v. United States, 8 Cir., 226 F.2d 585, 589; Giardano v. United States, 8 Cir., 251 F.2d 109, 115; Hoyer v. United States, 8 Cir., 223 F.2d 134, 138.

Burger's conduct toward Cooper and Crocker after he had made the corporation tax returns, and the Internal Revenue investigations had begun, was clearly admissible as showing consciousness of guilt and criminal intent. See Luteran v. United States, 8 Cir., 93 F.2d 395, 399; Bruce v. United States, 8 Cir., 73 F.2d 972, 974; Segal v. United States, 8 Cir., 246 F.2d 814, 818; Green v. United States, D.C.Cir., 259 F.2d 180, 182. Indeed, a large part of defendant's own testimony concerned his own conduct during and after the investigation begun by revenue agents.

(d) Dealers, who paid cash over invoice price, and Cooper and Crocker were all permitted to give their estimates as to amounts of money that were received from some sales of cars over the amounts shown by the invoices of the sales, when that was the best evidence available. In view of the proof that the corporation's records of the amounts were false, there was no better evidence to be had in some instances than the recollection of the witnesses. There was no error in receiving their best recollection concerning amounts. They did not draw them out of the air. They had been deeply concerned and knew whereof they spoke. It was for the jury to appraise their testimony. They had known the exact amounts at the time of the transactions and we find no error in allowing their testimony. Further, the government was not obliged to show the exact amount of tax evaded. Gleckman v. United States, 8 Cir., 80 F.2d 394, 399–400; Beard v. United States, 4 Cir., 222 F.2d 84, 89, citing United States v. Johnson, 319 U.S. 503, 517–518, 63 S.Ct. 1233, 87 L.Ed. 1546.

### III.

Appellant contends that the court erred in failing to instruct the jury, as requested, to the effect that "if the corporation did not authorize Carlisle Cooper and Munson Raymond Crocker to receive [the cash payments they received over the invoice prices] and did not ratify the receipt thereof" that "said payments were not corporate income" and it is argued that the judgment should be reversed on account of the error.

But there was no occasion for the court to give an instruction in that form to confuse the jury. In order to show that Cooper and Crocker were authorized to sell the corporation's cars, as they did, so as to receive the cash payments they received over the invoice price for the corporation's cars, the government relied on the evidence that defendant Burger, president of the corporation in full control of its business, at its places of business, was the one who directed the transactions. He denied it and said he had no knowledge of any of the transactions and never got any part of the proceeds. The issue contested before the jury trying Burger was, therefore, whether or not he did have knowledge and under-

standing of and authorized and directed the sales as Cooper and Crocker made them. That was the issue to which the court directed itself and instructed, fully and clearly; that it was necessary, in order to convict Burger, to establish beyond reasonable doubt defendant's knowledge and understanding of all the essential elements of the offense; all of which were fully explained; and that he made omissions in his corporate tax returns wilfully and knowingly and with intent to evade and defeat a tax that he knew to be owing.

Corporations act only through their agents and if Burger knew of and directed the sales of the corporate property as made, he could not exclude the consideration received on the sales from his return of the corporate income. Even if taking part of the consideration by Burger, Cooper and Crocker could be regarded as stealing or embezzling or receiving constructive dividends, the taking was from the corporation. First it was income to the corporation.

Pertinent declaration was made by the First Circuit in Currier v. United States, 166 F.2d 346, where the defendant took to his own use remittances sent to his family corporation, of which he was the president, in payment of goods sold by it, and failed to make tax return in respect to the remittances taken, either for himself or for the corporation. The indictment under 145(b) was against both the corporation and its president and the court summarized its conclusion in the final paragraphs of its opinion (166 F.2d at page 348) as follows:

"In short the case is one of an individual attempting to evade taxes on himself and on his corporation. No purpose would be served by a

further review of the evidence or the defendants' contentions.

"The judgments of conviction were proper and are affirmed."

We find no error, either in instructions given or those refused.

### IV.

■ The defense naturally expressed horror at the perjury proven against witnesses Cooper and Crocker which each of them disclosed early in his testimony. Naturally the entries made by Cooper, concerning the sales of each of 941 cars, and the numerous reported interrogations of him, also opened a very wide field for cross-examination of him in this case. It was liberally availed of by defendant. Complaint is made here because the court expressed the hope during the trial that counsel would not " * * * find it necessary to go over every statement * * * " Cooper made and that counsel could " * * * limit [the] cross-examination [as to the perjury] to some degree to conserve the time of the Court and jury". No exception was taken to the court's remark and it was made with such respectful courtesy and consideration towards counsel that none could be taken. See Adams Dairy Company v. St. Louis Dairy Company, 8 Cir., 260 F.2d 46, 55–56 and cases cited there. Counsel was not in any way limited in the cross-examination. The court's remarks present no ground for criticism or reversal of the judgment.

### V.

■ Substantial evidence supports the verdict.

We find the judgment to be without error.

Affirmed.