443 F.2d 535
 Fed. Sec. L. Rep. P 93,082
UNITED STATES of America, Appellee,
v.
Donald P. SMALLWOOD, Appellant.
UNITED STATES of America, Appellee,
v.
Roy E. LAY, Appellant.
UNITED STATES of America, Appellee,
v.
Harold F. CONELL, Appellant.
 Nos. 20000, 20001, 20010.
 United States Court of Appeals, Eighth Circuit.
 June 14, 1971.
 
 Stephen H. Gilmore, Daniel V. O'Brien, St. Louis, Mo., for appellants, Donald P. Smallwood and Roy E. Lay.
 Hiram W. Watkins, St. Louis, Mo., for appellant, Watkins.
 Harold E. Zahner, Asst. U.S. Atty., St. Louis, Mo., Daniel Bartlett, Jr., U.S. Atty., for appellee.
 Before MATTHES, Chief Judge, GIBSON Circuit Judge, and HENLEY, District Judge.*
 MATTHES, Chief Judge.
 
 
 1
 These appeals stem from judgments of conviction entered upon jury verdicts in the United States District Court for the Eastern District of Missouri. Appellants Smallwood and Lay were found guilty on all 15 counts submitted to the jury-- seven counts of securities fraud in violation of 15 U.S.C. 77q(a), seven counts of mail fraud in violation of 18 U.S.C. 1341, and one count of mailing an unregistered security in violation of 15 U.S.C. 77e(a)(2). Appellant Conell was found guilty only of the count charging a violation of 15 U.S.C. 77e(a)(2).[1]
 
 
 2
 The illicit activities which formed the basis for these convictions took place from 1965 to 1969. In November of 1965, Diversified Brokers Company was incorporated under the laws of the State of Missouri by appellant Smallwood, his wife, and appellant Lay, all of whom were also shown by the corporate records to be the shareholders and directors of the company. Smallwood was the President of Diversified, Lay the Vice President and Secretary. Minutes of an annual meeting of the Board of Directors in November of 1967 show that Conell was at that time elected Treasurer of the corporation.
 
 
 3
 The basis of the fraudulent scheme engaged in consisted of selling promissory notes to investors for cash received. The sales were induced by representing to prospective investors that they would receive exorbitant rates of return on these investments ranging up to 100% Interest per annum. In addition to promising to pay these unusually high rates of interest, appellants also induced persons to loan money to Diversified by misleading and false representations including statements that each investment was assigned to a specific 'project' identified by number, that the business projects engaged in consisted of buying and reselling government surplus and distressed merchandise at huge profits, when, in fact, the amount of Diversified's business in distressed merchandise was infinitesimal compared to the total sum received from investors. Instead of using the funds so obtained to purchase surplus merchandise for resale, large sums were wrongfully and unlawfully diverted to purchase personal property consisting of jewelry, objects of art, luxury automobiles and expensive yachts which were taken possession of in large part by appellants Smallwood and Lay.[2] The result was inevitable-- the company was operated at a substantial loss each year. The record shows that literally thousands of persons from a number of states loaned millions of dollars to diversified under the impression that the company operated a highly profitable and legitimate business. As might be expected, many of the investors were those persons most likely to succumb to appellants' misrepresentations-- clergy and active members of religious organizations, elderly persons investing life savings in the venture, laborers, and generally those elements of society unsophisticated in the ways and means of financial enterprise. While it is difficult to determine the amount that will eventually be restored to the investors, for the reason that the assets recovered by the receiver are now being liquidated in bankruptcy proceedings, it is apparent that a substantial over-all loss will be sustained.
 
 
 4
 Appellants Smallwood and Lay have consolidated their assignments of error on appeal. They do not contest the sufficiency of the evidence to support the jury verdict except as to Count Twenty-one which charged the mailing of an unregistered security. In addition, they assert that the trial court erred: (1) in overruling their second supplemental motion to suppress evidence; (2) in admitting into evidence certain government exhibits; (3) in overruling their motion for a bill of particulars; (4) in imposing the punishments assessed. As seen below, appellant Conell limits his assignment of error on appeal to issues which relate to the sufficiency of the evidence to support his conviction on the charge of mailing an unregistered security. Each of these contentions will be considered seriatim.
 
 MOTION TO SUPPRESS
 
 5
 In their second supplemental motion, appellants Smallwood and Lay sought to suppress from evidence Grand Jury Exhibits Nos. 10 and 11 consisting of 20 files of documents, including invoices and sales contracts evidencing purchases of automobiles, boats, real estate, insurance policies, dismonds and contracts for the painting of a home and installation of a burglar alarm system.
 
 
 6
 On February 17, 1969, the Securities and Exchange Commission filed a complaint in the United States District Court, Eastern District, Missouri (Civil Action No. 69C57(2)) against Diversified Brokers Company and appellants charging violations of the Securities Act of 1933. On February 27, 1969, Diversified and all three appellants consented to a final judgment enjoining and restraining Diversified from violating the Securities Act and to the appointment of a receiver to take charge of all the assets and property of Diversified. After his appointment, the receiver took possession of the corporate offices and their contents and also obtained numerous files and records from the offices of Satz and Ponfil, attorneys for Diversified. On March 19, 1969, the receiver was served with a subpoena to appear before the Grand Jury and to bring all the records of Diversified. Pursuant to that subpoena, the records which appellants sought to suppress in their second supplemental motion were turned over to agents of the government.
 
 
 7
 In the district court, appellants alleged that Grand Jury Exhibits Nos. 10 and 11 consisted of personal, not corporate, records, and that they therefore had standing to challenge the admissibility of these records into evidence on the ground that they were obtained as the result of an unlawful search and seizure. Alternatively, appellants maintained that even if the records were corporate, they still had standing to object to the search and seizure under the doctrine of Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).
 
 
 8
 Assuming they had such standing, appellants contended that the search and seizure was unreasonable because made without a warrant and without their consent. This argument was premised upon the theory that attorneys Satz and Ponfil who voluntarily turned over many of the files to the receiver, could not validly consent to or waive appellants' right to contest the search and seizure.
 
 
 9
 After an evidentiary hearing, the district court denied appellants' motion, finding that the records sought to be suppressed were corporate records[3] and holding that appellants had no standing to attack their search and seizure and that the records were properly obtained. In asserting that the district court erred, appellants rely upon the same arguments presented in support of their motion in the trial court.
 
 
 10
 We find no merit in appellants' contention that these records were personal. Appellants offered absolutely no evidence to support their allegation that the papers in question were their personal files. On the contrary, the government presented the testimony of an accountant for the Securities and Exchange Commission who tied in all of the documents in question with the corporate records which clearly showed that the files referred to were property of Diversified Brokers Company.
 
 
 11
 We next consider whether appellants nevertheless had standing to object to the search and seizure of these corporate records. Appellants rely heavily upon the Supreme Court's holding in Mancusi v. DeForte, supra, which involved the seizure of records from an office shared by the defendant and other union officials. Even though the papers seized were union records and not personal records, the Supreme Court found that the defendant had standing to object to the search of his office and the seizure of these records. However, the facts upon which the Supreme Court premised its holding in Mancusi differed substantially from those in the case before us. First, in Mancusi, the union official was legitimately on the premises when state officers conducted the search and seizure. See Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Moreover, it was stipulated by the parties that the official had custody of the papers at the moment of their seizure. Mancusi v. DeForte, supra at 368-369, 88 S.Ct. 2120.
 
 
 12
 In the case before us, the records were obtained by government agents pursuant the court-appointed receiver for ward the court-appointed receiver for Diversified. At the moment the files in question were turned over, the receiver had actual, lawful custody of the records, and appellants were not, nor did they have a right to be, present either when the records were turned over in compliance with the subpoena or when the receiver initially took possession of the files at the corporate offices of Diversified and at the offices of Satz and Ponfil.
 
 
 13
 Secondly, the records seized in the Mancusi case were union records, and were taken as the result of a physical search. It has long been the established rule that corporate records may be subpoenaed and that the privilege of the Fourth Amendment is not available to a corporate officer to prevent the use of these records against him. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Fineberg v. United States, 393 F.2d 417 (9th Cir. 1968); Galbraith v. United States, 387 F.2d 617 (10th Cir. 1968); United States v. Fago, 319 F.2d 791 (2d Cir.), cert. denied 375 U.S. 906, 84 S.Ct. 197, 11 L.Ed.2d 146 (1963). In this regard, it is significant that the Court in Mancusi specifically noted that the earlier Supreme Court decision in Wilson, supra, was not contrary to its holding because Wilson, like the matter presently before us, involved no physical search but rather the obtaining of corporate records pursuant to a subpoena duces tecum. Mancusi v. DeForte, supra at 367, n. 4, 88 S.Ct. 2120.
 
 
 14
 Finally, in Mancusi, the Court emphasized that the union official could reasonably have expected not to be disturbed in his private office except by personal or business invitees and that records contained in that office would not be touched without his consent. In other words, the area was one in which there was a reasonable expectation of freedom from governmental intrusion. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the case before us, a receiver was appointed by the district court upon the petition of the Securities and Exchange Commission in which it was specifically charged that Diversified and appellants were engaging in practices which constituted violations of the Securities Act of 1933, and upon the further allegation that appointment of a receiver was necessary to conserve the assets of the corporation to protect its investors. A receiver is an officer of the court. Powell v. Maryland Trust Co., 125 F.2d 260, 271 (4th Cir.), cert. denied 316 U.S. 671, 62 S.Ct. 1041, 86 L.Ed. 1746 (1942). He is not an agent or employee of either party to the litigation in which he was appointed. Bowersock Mills & Power Co. v. Joyce, 101 F.2d 1000, 1002 (8th Cir. 1939); Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946). In Kroll v. United States, 433 F.2d 1282 (5th Cir. 1970), the court was presented with a search issue nearly identical to that in the case before us. The court held that the defendant, the sole stockholder and president of a corporation petitioned into bankruptcy, had no standing to attack a search of corporate records conducted after a trustee had been appointed and had taken possession of the premises and records of the company. In finding that the defendant could not reasonably expect freedom from governmental intrusion once the trustee was appointed, the court noted:
 
 
 15
 'We think it significant that the trustee is under a duty to report to the United States Attorney any probable criminal violations of the bankruptcy act and to disclose to that official all relevant information. Title 18, U.S.C., Section 3057. In light of the strong governmental interest in protecting creditors in a bankruptcy situation a bankrupt would indeed be shortsighted if he did not perceive that many interested parties, governmental or otherwise, might be interested in examining the books of the bankrupt business. Reasonable expectations are that government officials will be examining the books.'
 
 
 16
 Id. at 1289. Section 3057, Title 18, U.S.C. places a like duty upon a court-appointed receiver. Moreover, under the circumstances of this case it would have been completely unrealistic for appellants not to anticipate that government agents would be interested in examining the corporate records of Diversified.
 
 
 17
 For all reasons discussed herein, we find that appellants Smallwood and Lay did not have standing to object to the seizure of these corporate records and that the district court did not err in denying the second supplemental motion to suppress. Accordingly, it is unnecessary to discuss the further contention of appellants that attorneys Satz and Ponfil could not validly consent to the turning over to the receiver of those files of Diversified which were in their possession, as any objection on this ground is necessarily dependent upon their standing to object to the seizure.
 
 ADMISSION OF EXHIBITS
 
 18
 Appellants Smallwood and Lay assert that the trial court erred in admitting into evidence over their objections certain government exhibits which were introduced for the purpose of showing the financial condition of Diversified. Appellants premise their objection to the use of these exhibits on the basis that they were not shown to be accurate.
 
 
 19
 We have carefully examined the evidence pertinent to the admission of these materials and find no merit to appellants' assertion of prejudicial error. The exhibits referred to were either themselves the actual records of the company or were summaries of actual records already in evidence. These exhibits were introduced by the government through the testimony of witnesses who had personally prepared these documents. The witnesses were subjected to thorough cross-examination by the defense, and the small percentage of error or the possibility of any inaccuracy in the exhibits was fully developed before the jury. Moreover, the trial court was careful to instruct the jury that the summaries were not evidence as such, but were only for their assistance in considering the evidence which they purported to summarize.
 
 
 20
 The court room use of summaries of business records, particularly where the actual records are voluminous or complex, is not only proper, but advisable. Boston Securities, Inc. v. United Bonding Insurance Co., 441 F.2d 1302 (8th Cir. 1971); Peter Kiewit Sons' Co. v. Summit Constr. Co., 422 F.2d 242, 267 (8th Cir. 1969). Evidential use of such summaries rests within the sound discretion of the trial judge, whose action in allowing their use may not be disturbed by an appellate court except for an abuse of discretion. United States v. Brickey, 426 F.2d 680, 686-687 (8th Cir. 1970), cert. denied 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); Koolish v. United States, 340 F.2d 513, 533 (8th Cir.), cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed. 724 (1965); Franano v. United States, 277 F.2d 511, 515 (8th Cir.), cert. denied 364 U.S. 828, 81 S.Ct. 68, 5 L.Ed.2d 57 (1960). The claimed error in the accuracy of the summaries was fully presented to the jury, and in our view the relatively few inaccuracies went to the weight of the evidence and not its admissibility. See Elbel v. United States, 364 F.2d 127, 139 (10th Cir.), cert. denied 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967); Hedrick v. United States, 357 F.2d 121, 123 (10th Cir. 1966); McDaniel v. United States, 343 F.2d 785, 789 (5th Cir.), cert. denied 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965).
 
 BILL OF PARTICULARS
 
 21
 Appellants Smallwood and Lay allege that the trial court erred in overruling their joint motion for a Bill of Particulars in which they sought an explanation of the term 'accumulated loss' as used in Count I of the indictment.
 
 
 22
 In considering this assertion of error, we bear in mind that motions for bills of particulars are addressed to the sound discretion of the trial judge whose ruling will not be disturbed on appeal except for a clear abuse of discretion. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927); Ross v. United States, 374 F.2d 97, 103 (8th Cir.), cert. denied 389 U.S. 882, 88 S.Ct. 130, 19 L.Ed.2d 177 (1967); Ray v. United States, 367 F.2d 258, 263 n. 5 (8th Cir. 1966), cert. denied386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967). We find no abuse of discretion in the district court's denial of the motion. That part of the indictment to which appellants refer specifically charged that as a part of the over-all scheme to defraud investors appellants concealed that as of September 30, 1968, Diversified Brokers had an accumulated loss of at least $1,800,000. This charge was sufficiently definite and certain to safeguard appellants' rights and to enable them to prepare their defense. The further explanation sought by appellants would have involved the disclosure of evidentiary detail which the government intended to present at trial, and this is not the function of a bill of particulars. Hemphill v. United States, 392 F.2d 45, 49 (8th Cir.), cert. denied 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968); Ray v. United States, supra; Johnson v. United States, 207 F.2d 314, 320 (5th Cir.), cert. denied 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087 (1953).
 
 COUNT TWENTY-ONE
 
 23
 This count charged that all three appellants, on or about January 30, 1968, did knowingly and willfully place and cause to be placed in the mails an unregistered security, to-wit, a promissory note issued by Diversified to Sharon and/or Dolores Fowler, in the amount of $9,200 to be delivered to Sharon Fowler in Belleville, Illinois, in violation of 5(a)(2) of the Securities Act of 1933 (Title 15 U.S.C. 77e(a)(2)).
 
 
 24
 Smallwood and Lay contend that there was insufficient evidence to establish that the mailing of the promissory note was willful and with criminal intent. Appellant Conell contends the government failed to prove that he willfully and knowingly committed the offense. Additionally, he asserts he did not participate in the Fowler transaction, had no direct knowledge of it and therefore 18 U.S.C. 2, commonly known as the Aider and Abettor Statute, cannot properly be invoked to sustain his conviction.
 
 
 25
 We find the contentions of the appellants lacking in substance and reject them.
 
 
 26
 At the outset, it is appropriate to note that as a prerequisite to a conviction under Count Twenty-one, the government was required to prove that a security unregistered with the Securities and Exchange Commission was carried or caused to be carried through the mails. Kistner v. United States, 332 F.2d 978, 981 (8th Cir. 1964). It stands undisputed that the Fowler note was executed in the principal amount of $9,200 on January 19, 1968. The note was signed by Diversified Brokers Company, Donald Smallwood, President. According to its terms, it matured on January 17, 1969 and bore interest at the rate of 100%. It was not registered. The evidence also conclusively shows that the note was placed in the mails by Diversified and was received by the payees.
 
 
 27
 Criminal intent and guilty knowledge relate to the condition of the mind. Ordinarily, of course, one who engages in conduct of a character similar to that presented by this record, does not proclaim his intent to defraud innocent victims. Since the condition of the mind is rarely susceptible of direct proof, recourse must be had to all pertinent circumstances. Leffler v. United States, 409 F.2d 44, 50 (8th Cir. 1969); Anderson v. United States, 406 F.2d 529, 532 (8th Cir. 1969); Jackson v. United States, 330 F.2d 679, 681 (8th Cir.), cert. denied 379 U.S. 855, 85 S.Ct. 105, 13 L.Ed.2d 58 (1964). Here we find overwhelming evidence which fully warranted the jury's implicit finding of criminal intent and knowledge.
 
 
 28
 Appellant Conell seizes upon the fact that the jury acquitted him of all of the other counts,[4] and submits that having been exonerated of implication in the scheme, his conviction under Count Twenty-one cannot be sustained.
 
 
 29
 The weakness of Conell's argument is that the case was properly submitted to the jury on a valid theory in connection with Count Twenty-one. The court, in accordance with 18 U.S.C. 2, instructed the jury that whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is a principal and is legally responsible. Conell, anticipating that the government would rely upon the 'Aider and Abettor' Statute, argues in his brief that the statute is wholly irrelevant because he was acquitted of participation in the unlawful scheme. Thus, appellant would have us blind ourselves to all of the evidence, except that which was focused upon the Fowler transaction. This approach is untenable. The question whether Conell aided and abetted in the mailing of the unregistered security necessarily requires us to consider and appraise all of the evidence which has relevance to that issue. And, of course, the evidence must be viewed in the light most favorable to the verdict of guilt on Count Twenty-one.
 
 
 30
 A brief resume of all of the evidence will serve to place Conell's involvement in Count Twenty-one in proper perspective. He associated himself with Diversified at approximately the same time it was incorporated and shortly thereafter he devoted full time to his official duties. Although he was not one of the original incorporators or a director of the company, he was designated as its Treasurer and knowingly was appointed to and held the office of Executive Secretary. In connection with his official duties, he was furnished and occupied a separate office in the company's headquarters in St. Louis, Missouri. His primary function, in his own words was to 'raise funds for the company.' This entailed obtaining, selecting and supervising representatives in various states to solicit funds for Diversified. Conell has been an active member in the Pentecostal Church of God for a number of years. Many ministers of that faith favorably known to Conell were induced by him to invest their funds and to engage as representatives under Conell's supervision in obtaining other investors. In each instance, the investor received a promissory note of Diversified, some of them being signed by Conell who had authority to act in that capacity.
 
 
 31
 In October of 1966, Conell attended a church convention in the State of Ohio. He was afforded the opportunity to address the delegates for the purpose of persuading them to loan their money to Diversified and to become soliciting representatives for the company. He made numerous representations to different prospective investors for the purpose of lulling them into believing that Diversified was operating a legitimate business at a profit, and that the investors' funds would not only be secure but that a high rate of interest would be paid thereon. He informed one individual who invested $23,000 that he, Conell, was 'worth about $5,000,000', and left the definite impression that he had become wealthy through his connections with Diversified. Conell informed a minister who invested $8,000 that he knew '85 to 90% Of what the company was doing.' He approved and signed statements of account of Diversified which were mailed to representatives engaged in seeking investors and knew that the statements were prepared for the purpose of securing funds for the company. And he was fully aware that the statements and notes issued by Diversified were sent through the United States mails from time to time.
 
 
 32
 Additional review of the evidence pertaining to Conell's authority and his admitted activities would unduly prolong this opinion. We conclude this aspect of his aiding and abetting in the commission of the Count Twenty-one offense by observing that his efforts for Diversified were fruitful. According to his testimony, he personally raised '$150,000, maybe $200,000'. This, of course, does not include the amount Diversified acquired through representatives under Conell's supervision.
 
 
 33
 The other face of the coin deals with the benefits Conell unjustly reaped. Although the amount that he received from Diversified which had been mulcted from a countless number of investors is not comparable to the staggering amounts wrongfully appropriated by Smallwood and Lay, it is undisputed that Conell received approximately $80,000 during the relatively short existence of the company by way of bonuses, automobiles, overriding commissions, a so-called loan to enable him to purchase a $40,000 home, and other items.
 
 
 34
 In light of the foregoing facts and a large quantity of other relevant evidence which we have not detailed, we are not persuaded to hold that the evidence was insufficient as a matter of law to show that Conell was an aider and abettor within the meaning of 18 U.S.C. 2. See Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Peterson v. United States, 405 F.2d 102 (8th Cir. 1968), cert. denied 395 U.S. 938, 89 S.Ct. 2003, 23 L.Ed.2d 453 (1969); White v. United States, 366 F.2d 474 (10th Cir. 1966). We hold this was a jury question.
 
 
 35
 It appears to us that the most that can be said of Conell's case is that there was an inconsistency in the jury's verdict. Although he does not expressly make such an assertion, that argument is implicit in his contention that his conviction cannot stand because of his acquittal on all other counts. But it has long been settled that consistency in the verdict is not necessary. In Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932), Mr. Justice Holmes wrote:
 
 
 36
 "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."
 
 
 37
 We have recognized and applied the same principle. Canaday v. United States, 354 F.2d 849, 855-856 (8th Cir. 1966); Schaefer v. United States, 265 F.2d 750, 754-755 (8th Cir.), cert. denied 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959).
 
 SENTENCES
 
 38
 Finally, appellants Smallwood and Lay suggest that the district court abused its discretion in imposing a sentence of 35 years and 20 years on Smallwood and Lay, respectively, and in assessing a $15,000 fine against each. These appellants concede, as they must, that the prison terms are well within the maximum that could have been imposed,[5] but invite our attention to the case of United States v. West Coast News Co., 357 F.2d 855 (6th Cir. 1966), reversed on other grounds sub nom Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967). We have considered West Coast, where the court affirmed, but suggested that it was within the power of the district court under Rule 35, Fed.R.Crim.P., to reduce the prison sentences imposed. We are not inclined to suggest to the district court in this case the obvious, to-wit, that appellants have the right upon filing of the mandate to file a Rule 35 motion.
 
 
 39
 It is well established that an appellate court will not disturb a sentence within the statutory limit which the district court imposed in the exercise of its discretionary power. Our court has taken a consistent approach on review of sentences. United States v. Dennison, 437 F.2d 439, 440 (8th Cir. 1971); Jones v. United States, 396 F.2d 66, 69 (8th Cir. 1968), cert. denied 393 U.S. 1057, 89 S.Ct. 695, 21 L.Ed.2d 697 (1969) and cases there cited.
 
 
 40
 There is some disparity in the sentences imposed upon Smallwood and Lay but again, the difference in the treatment accorded these two appellants was within the discretion of the district court. Judge Harper, being fully aware that appellant Smallwood was the 'prime mover' in the operations of Diversified, imposed a heavier sentence upon him. Although Lay was deeply involved, he was not the ring leader of the scheme and consequently received a lighter sentence.
 
 
 41
 We recognize that the sentences imposed upon Smallwood and Lay are severe. But we are also mindful, as was the district court, that the hardship and suffering endured by thousands of unsuspecting individuals, including many elderly persons, as the result of the nefarious operations of Smallwood and Lay, was also severe.[6]
 
 
 42
 By way of summary, the record convinces us that all of the appellants received a fair trial. They were represented by retained counsel, who demonstrated their competence in defending the charges. The evidence of guilt was overwhelming; no errors of law affecting the substantial rights of the appellants occurred. Therefore, the judgments of conviction should be and are affirmed.
 
 
 
 *
 Chief Judge, United States District Court, Eastern District of Arkansas, sitting by designation
 
 
 [1]
 All three appellants were originally indicted in 21 counts. At the close of its case, the government withdrew Counts 2, 5, 7, 18, 19 and 20 as to all appellants
 
 
 [2]
 By way of example, the record shows that appellants Smallwood and Lay purchased at retail $263,639.63 in jewelry and diamonds from one jewelry store, and that appellant Smallwood made purchases at retail of $884,239.89 in antiques, objects of art and jewelry at the Four Seasons Antique Shop
 
 
 [3]
 The motion was granted as to File No. 5, consisting of an invoice and title application on a 1968 Cadillac Fleetwood on the basis that this was a personal record
 
 
 [4]
 A canvass of the voluminous record of the seven days of trial leaves us with the firm conviction that there was ample evidence which would have warranted the jury in finding Conell guilty of all of the submitted counts. The evidence will be discussed in more detail, infra
 
 
 [5]
 Smallwood and Lay could have received a total of 75 years in prison and fines totalling $47,000
 
 
 [6]
 Judge Harper, the seasoned trial judge, stated during the sentencing proceeding that during his tenure of 22 years on the bench, he had tried many mail fraud and SEC cases and that 'without question this is the most vicious one that I have ever tried.'