**UNITED STATES of America,
Appellee,**

v.

**A. R. HENDERSON, Also Known as
Bobby Henderson, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**John A. O. SWAVING, Appellant.**

**Nos. 20541, 20546.**

United States Court of Appeals,
Eighth Circuit.

Aug. 4, 1971.

5. H.Rep.No.1549, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. and Ad.News, p. 4027.

Joseph P. Stevens, Minot, N. D., for appellant Henderson.

Jonathan C. Eaton, Jr., Orlin W. Backes, Minot, N. D., for appellant Swaving.

Gary Annear, Asst. U. S. Atty., Fargo, N. D., Harold O. Bullis, U. S. Atty., Tom Boyle, Staff Atty., Denver, Colo., for appellee.

Before ALDRICH,[*] LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

Defendants John A. O. Swaving and A. R. Henderson, a/k/a Bobby Henderson, appeal their convictions on two counts of securities fraud under 15 U.S.C.A. § 77q(a). Henderson additionally appeals his conviction on two counts of mail fraud under 18 U.S.C.A. § 1341. The jury found Swaving innocent of the mail fraud counts and both defendants were found not guilty of a conspiracy count.[1] The alleged offenses occurred in the State of North Dakota. On appeal error is alleged as to the insufficiency of the evidence, the instructions to the jury, the admission of hearsay as to conversations and conduct of the alleged co-conspirator, one Emil J. Dombowsky,[2] and error is alleged as to the admission of documentary evidence. We affirm the judgments against both defendants.

The basic facts show that in 1963 Emil J. Dombowsky and two others incorporated Shoppers Charge Plan, Inc. (hereinafter Shoppers Charge) in North Dakota. The company issued personal credit cards which would be honored for purchases at participating stores. The corporation purchased the credit card charge slips from the stores at a six percent discount and in turn would bill and collect the full sale amount from the customer. In order to finance the Shoppers Charge operation thirty day demand notes and loan deposit agreements were sold to individual investors. The notes purported to carry seven percent interest.

In late 1963 or early 1964, the sole stockholders were Dombowsky, his wife and a Russ Morrison. Defendants Henderson and Swaving became associated with Shoppers Charge in 1966.[3] Although neither owned stock, defendant Henderson assumed the title of "Business Manager" and Swaving was the "Account Executive." Both defendants were active in selling the demand notes as well as in soliciting new stores to join the credit plan. The evidence showed some $500,000 was raised by the corporation between 1963 and 1966; of that amount approximately $400,000 was raised in 1966. The defendants, like the other salesmen for the corporation, received a fifteen percent commission on all security sales besides a small salary. The evidence showed that at the time of

---

[*] Of the First Circuit, sitting by designation.

1. Henderson was given concurrent sentences of three years on both of the securities counts and on one of the mail fraud counts. The sentence on the other mail fraud count was suspended and he was given a three year probation to run consecutively with his three year sentence on the other counts. Swaving received a two year sentence on one security fraud count and was placed on probation for two years on the other count to run consecutive to his two year sentence.

2. Dombowsky at the time of trial was still a fugitive, apparently having fled the country.

3. When financial difficulty of Shoppers Charge became public it was succeeded sometime in December 1966 by SCP Credit Card Corporation. Since the indictment did not mention the successor corporation all evidence was excluded which pertained to events occurring after the succession by the new corporation.

trial Henderson had received $18,275.19 in advances; Swaving $10,555.84. According to these records Henderson was entitled to $19,183.95 in commissions while Swaving was credited with $8,210.74. Both defendants had used their "Executive" Shoppers Charge credit cards at various stores so that their balances owing were $5,282.47 for Henderson and $15,969.05 for Swaving.[4] Swaving produced a statement for $15,000 allegedly owed to him by the corporation for services and a receipt signed by Dombowsky for $696 which Swaving had allegedly paid on his outstanding balance.

The evidence adduced by the government showed that Henderson made sales of the demand notes to eleven persons, one brought him a security fraud count and another the mail fraud count. Swaving made several sales to the other security fraud count victim. According to a CPA's review of its financial records the corporation was at all times insolvent during its operation. The evidence is replete with instances where only isolated interest payments were made to investors. Only a few people ever received back any of their principal investment. When confronted by the officers of the successor corporation which forced him out, Dombowsky admitted his responsibility for taking and misusing "a lot of funds" but not all of it. Neither defendant took the stand.

The North Dakota Commissioner of Securities commenced an investigation of Shoppers Charge on March 14, 1966, concerning its sales of short-term promissory notes. The Commissioner determined that these notes constituted securities and that their sale without state registration was unlawful. At a May 6, 1966, meeting with the Commissioner, Dombowsky furnished what he purported to be a complete list (later found deficient) of all Shoppers Charge investors, and he promised to offer all investors a full refund with interest and to refrain from further sales until such time as the company was in compliance with North Dakota securities law. On these assurances no formal action was taken at that time by the Commissioner. However, found in the records of Shoppers Charge was a document signed by Swaving to Dombowsky, dated July 28, 1966, as a receipt of payment for "Services rendered" with a notation, "$1,000 to be delivered to D.H. at Commissioner of Securities office." At that time Donald R. Holloway was the Deputy Securities Commissioner as an Assistant Attorney General assigned to the Securities Commission. Holloway testified that Swaving came to his office on August 23, 1966, and offered him two expensive wristwatches which Holloway refused. Later when Swaving was questioned about the $1,000 by an officer of SCP Credit Card Corp. (the successor corporation) during an audit of the books, Swaving said that it had been given him "to get the State Securities Commissioner off our back. * * *" Holloway never took anything from Swaving.

The defendants point to several factors to support their contention that they lacked the necessary criminal intent. The CPA who audited the books and records of Shoppers Charge testified that it would have taken several days of steady work to ascertain the true financial condition of the company and that only one record existed from which this could have been done. Further, it would have been "nigh unto impossible" for anyone but an expert accountant to come to the right conclusion. There is ample evidence that Dombowsky kept the books and records under lock and key, opening them to no one but a bookkeeper who was once hired to transcribe journal entries.

It is also urged that the defendants had no knowledge of the insolvency of

---

4. Dombowsky's brother-in-law, who ran the company's operations, testified he became concerned with the increasing balances due on the defendants' credit card charge accounts. He called Dombowsky's attention to this, "but the only answer I (the brother-in-law) could get is that he would look after them. * * *"

the company, that at all times they were acting in good faith in making the misrepresentations, that Dombowsky was "a one man show," that they were unaware of any scheme, that they did not profit beyond their earned commissions and wages, and that the evidence showed they later warned investors about Dombowsky. On the other hand, the jury weighed evidence that Swaving had a good working knowledge of the corporation records in that he displayed familiarity with the books and records during an examination after the successor corporation took over. He even at times pointed out that certain letters and instruments were missing from the files. There was testimony that Swaving boasted that while he was "crooked," he was too smart to be caught; that his name would not be found on any legal documents and that there wasn't any evidence that anybody would get against him. As mentioned above, the jury received evidence that Swaving took $1,000 from Dombowsky and attempted to bribe the Deputy Commissioner of Securities.

As to the defendant Henderson, the jury heard evidence that he managed the office during Dombowsky's absence; that he signed many business letters and securities. As business manager he dealt with several of the investors and held out that the company was in good financial condition and purchase of the notes was a "good investment." In August, 1966, in order to induce a previous investor Emil Wanner to commit an additional $5,000, Dombowsky sent Henderson to deal with him. Henderson represented that the company at that time was financially hard up and needed money. At the same time Henderson borrowed from another investor, Elmer H. Shafer, $15,000 on behalf of the corporation. The evidence showed that Henderson was fully aware of the intervention of the North Dakota Securities Commission into the corporation's activities. As discussed, Dombowsky had previously promised to comply with the Commissioner's requirements. Yet after this promise Henderson wrote a letter to one investor on August 8, 1966, indicating some knowledge of the financial condition of the corporation as well as his willingness to operate the scheme in disregard of the state authorities.[5]

■ We cannot say as a matter of law that the evidence negates intent to defraud or precludes a finding that the

---

5. The letter reads:
"Dear Mr. & Mrs. Johnson,
"We are in receipt of your letter of August 3, 1966. Also we have a letter of similar content to one you must have recently received. The letter you received from an attorney was from our attorney, Mr. Joe Stephens. Mr. Stephens represents Shoppers Charge Plan, Inc.
"We have as of this date complied with every request made by the Securities Commissioner of North Dakota. The notes we sell do not, according to law, come under the jurisdiction of the Securities Commissioner of North Dakota. In view of the continued growth of SCP, it will be necessary in the future to sell notes which have maturity dates exceeding 12 months. In preparation of the selling of these notes, we made a full disclosure to the Securities Commissioner. They, in their abrupt and crude manner, caused some of our investors to make a similar inquiry.

"First: It is not necessary for you to answer any of the letters which you have received. Second: According to the contract you may withdraw any part or all of your money at any time. We reserve the right to withhold payment 30 days, however, as of now it has not been necessary for us to ever do so. I tried to call today but the information operator did not have a listing for Mr. Leonard O. Johnson, Mr. L. O. Johnson, or Cleo Johnson.
"Mr. Dombowsky is in California on a combination business trip and vacation and will not return until this weekend, therefore, I am pinchhitting for him. We have now opened offices in Williston. Next will be Grand Forks and Fargo.
"I hope in some way this letter has been reassuring.
                "Sincerely yours,
                Bobby Henderson
                Sales Manager"

defendants consorted with Dombowsky in a fraudulent scheme. The question presented here is one requiring factual resolution. Viewing the evidence in light most favorable to the government, we find the evidence sufficient to uphold the jury's determination that the overall circumstances sustained a finding of defendants' intent and participation in a scheme to defraud. The standards of proof surrounding intent and guilty participation have been amply discussed in recent cases and need no further amplification. See, United States v. Smallwood, 443 F.2d 535 (8 Cir. 1971); United States v. Porter, 441 F.2d 1204 (8 Cir. 1971); United States v. Prionas, 438 F.2d 1049 (8 Cir. 1971).

■ Complaint is made here, as in the recent *Porter* case, that the jury's verdict of not guilty in the conspiracy count rules out all evidence except that relating specifically with the substantive counts charged. There is no basis to attack the verdict as inconsistent. See United States v. Porter, supra; Koolish v. United States, 340 F.2d 513 (8 Cir. 1965), cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724. The evidence is undisputed that Henderson and Swaving did not join Dombowsky's activities until 1966. The conspiracy charged in the indictment allegedly was formed in 1963. Though conspirators may join an existing illegal agreement to further its illicit object, under the indictment the jury could have reasoned the conspiracy did not exist as specifically charged. An appellate court, however, need not speculate as to the reasons for the jury's findings, be they founded on some logical or illogical basis.

■ The jury was properly instructed that evidence relating to the acts of conspirators did not bind the defendants until such time that there was proof that an illegal scheme to defraud existed. Under the substantive counts the jury found such an illegal scheme which included the overt acts charged. Judge Woodrough's statement in Reistroffer v. United States, 258 F.2d 379, 387 (8 Cir. 1958) is applicable here:

"Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen, proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. *As in the case of a conspiracy in operation the acts and declarations of each participant are admissible against all.* The record shows that the conditions on which the court permitted the testimony that would otherwise be hearsay to be considered by the jury were indicated by the court immediately through the inquiries made to the prosecutor; his replies; and the applicable law stated; reiterated constantly for the defendants; conceded by the prosecutor; and fully explained to the jury by the court in the instructions given."[6] (Emphasis ours.)

See also, Isaacs v. United States, 301 F.2d 706, 725 (8 Cir. 1962), cert. denied 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58; Miller v. United States, 410 F.2d 1290, 1294 (8 Cir. 1969), cert. denied 396 U.S. 830, 90 S.Ct. 81, 24 L.Ed.2d 80. Once the existence of a common scheme is shown to exist, only *"slight* evidence" is required to connect a particular defendant with the conspiracy. United States v. Warner, 441 F.2d 821, 830 (5 Cir. 1971). We think these principles govern

---

6. This court is aware of the evidentiary problem created when conduct of alleged co-conspirators is shown to the jury on the condition that an agreement or scheme to defraud, from which the conduct derived, will be proved later on. Operation of this rule permitting the conditional admission of such evidence, it has been noted, sometimes detracts from the rule of law which requires proof of the illegal scheme or agreement itself in order to establish guilt. See 82 Harv.L.Rev. 922, 933 (1959). In the case at hand we note that a prima facie proof of the illegal scheme was established.

the complaints made as to the evidence on the conduct of the two defendants vis-a-vis acts and admissions of Dombowsky. They likewise provide the nexus for establishing defendants' culpability on all the substantive counts, even though one or both defendants did not actually make the mailings or sales. Cf. United States v. Smallwood, supra.

■ Defendants further urge error concerning the court's instructions separating the evidence to be considered as to each of the respective counts. This claim must fall. Our discussion demonstrates that once the common scheme has been established all evidence relating to the scheme involving all participants is admissible.

■ There was sufficient evidence to refute the alleged good faith defense by the defendants. The jury could find from the evidence that the defendants had a working knowledge of the affairs of the company, that they collaborated with Dombowsky to operate a fraudulent scheme and they used the mails to lull investors into a false sense of security (see, United States v. Porter, supra). The argument that the defendants did not have knowledge of the financial plight of the company is refuted by Henderson's statements and conduct as well as by Swaving's familiarity with the books. Nevertheless, assuming *arguendo* that they did lack knowledge of the company's financial condition, the criminal law does not condone ignorance of facts as an excuse for reckless misrepresentations made to induce innocent victims to part with their money when the facts would require some preliminary investigation. It is well established that ignorance of inculpatory facts due to a reckless disregard is no more a defense than ignorance of inculpatory law. In Spurr v. United States, 174 U.S. 728, 735, 19 S.Ct. 812, 815, 43 L.Ed. 1150 (1899), the Supreme Court early observed:

"The wrongful intent is the essence of the crime. If an officer certifies a check with the intent that the drawer shall obtain so much money out of the bank, when he has none there, such officer not only certifies unlawfully, but the specific intent to violate the statute may be imputed. And so evil design may be presumed if the officer purposely keeps himself in ignorance of whether the drawer has money in the bank or not, or is grossly indifferent to his duty in respect to the ascertainment of that fact."

In Baker v. United States, 115 F.2d 533, 541 (8 Cir. 1941), this court noted, "[T]he charge that the representations were false was the legal equivalent of a charge that they were made in reckless disregard of the truth." Such irresponsibility can rise to the level of criminal conduct. Elbel v. United States, 364 F.2d 127, 134 (10 Cir. 1966), cert. denied 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967); United States v. Meyer, 359 F.2d 837, 839 (7 Cir. 1966), cert. denied 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71; Irwin v. United States, 338 F.2d 770, 774–775 (9 Cir. 1964), cert. denied 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965); United States v. Benjamin, 328 F.2d 854, 862 (2 Cir. 1964); United States v. Schaefer, 299 F.2d 625, 629 (7 Cir. 1962); Stone v. United States, 113 F.2d 70, 75 (6 Cir. 1940); Slakoff v. United States, 8 F.2d 9, 10 (3 Cir. 1925).

■ Defendants complain as to the admissibility of the business records of the corporation. These were maintained solely by Dombowsky. The basic complaint of error is that insufficient foundation was laid to receive the records into evidence under the Business Entry Act. 28 U.S.C.A. § 1732(a). We find the case of Pulley v. United States, 253 F.2d 796 (8 Cir. 1958), apposite in answering the defendants. There, the defendant claimed that certain payroll records were erroneously admitted because no adequate foundation was laid for their admission. The records were produced by the personnel manager of the corporation who neither kept them nor supervised their making. The court

said that while these factors may affect the weight of the evidence, once the records had been clearly identified by the personnel manager they were admissible under 28 U.S.C.A. § 1732(a). The original Business Entry Act, 28 U.S.C.A. § 695, was enacted by Congress so as to do away with the outdated rules which gave rise to its need and at which it was aimed. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1942). In interpreting that same original act this court recognized in Harper v. United States, 143 F.2d 795 (8 Cir. 1944), that the statute represented a loosening of the strict proof of authenticity which had theretofore been required. "The theory of section 1732 [28 U.S.C.A.] is to avoid the necessity of producing the person who actually participated in the transaction and then tracing through witnesses every step from payment to book entry." United States v. Re, 336 F.2d 306, 314 (2 Cir. 1964), cert. denied 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177; United States v. Dawson, 400 F.2d 194 (2 Cir. 1968), cert. denied 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

■ The last complaint of error relates to Exhibit No. 41. It is an affidavit, admitted into evidence, of an order dated September 12, 1966, and written by the North Dakota Securities Commissioner to Shoppers Charge Corporation not to issue corporate shares in an attempt to trade them for the company's outstanding demand notes. The date on the affidavit is subsequent to the dates of the substantive counts alleged. The government urges that the exhibit was properly admitted because it tended to prove criminal intent by the fact that the defendants were undertaking other illegal transactions similar to the ones charged. While it is true that the evidence need not relate directly to the specific offense charged, see, Von Feldt v. United States, 407 F.2d 95 (8 Cir. 1969), still we cannot abide by the government's claims. The affidavit was not evidence of another similar illegal transaction. It was simply evidence of the

Securities Commissioner's fear that the defendants would attempt to compound the danger to investors by issuing more worthless securities. It should have been excluded.

However, we do not find that this admission of evidence constitutes reversible error. Once we agree with defendants that the affidavit did not show a separate illegal act and did not show a criminal intent as to the offenses charged, then on the basis of the overall record we view the admission as nothing more than harmless error.

Judgments affirmed.