487 F.2d 355
 In the Matter of DIVERSIFIED BROKERS COMPANY, INC., Bankrupt.
UNITED STATES of America, Appellant,
v.
John A. NOONEY, Trustee, Estate of Diversified Brokers
Company, Inc., Appellee.
 No. 73-1264.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1973.
Decided Nov. 13, 1973.
Rehearing and Rehearing En Banc Denied Dec. 21, 1973.
 
 Donald H. Olson, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant.
 Stuart Symington, Jr., St. Louis, Mo., for appellee.
 Before HEANEY, ROSS and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The United States Government appeals from the District Court's denial of its claim for unpaid income taxes against the bankrupt, Diversified Brokers Company, Inc.
 
 
 2
 Diversified was incorporated under the laws of Missouri as a general business corporation in November of 1965. Its shareholders and directors were Donald Smallwood, his wife Betty and Roy Lay. The officers were Donald Smallwood, Roy Lay and Harold F. Conell. The corporation actively operated until February of 1969, when it was placed in receivership for violations of the Securities Exchange Act of 1934. The corporation was adjudicated bankrupt on April 22, 1969. Thereafter, the officers were convicted for securities and mail fraud and are currently serving their respective sentences-Smallwood, thirty-five years; Lay, twenty years; Conell, five years.
 
 
 3
 The principal source of the corporation's revenue was cash received from lenders in exchange for short term promissory notes issued by the corporation. The notes bore interest ranging from twenty-five to one hundred percent per annum. Numerous representatives, recruited by the corporation's officers, solicited the loans for a commission on the gross amount of the loans they solicited. For the most part, the representatives themselves were lenders to the corporation. The promise of high rates of interest, as well as reliance on false and misleading representations as to the nature of the corporation's business,[1] induced approximately 4,000 prospective lenders to loan in excess of seven million dollars to the corporation. Many of these lenders were, in the words of Chief Judge Matthes:
 
 
 4
 * * * those persons most likely to succumb to [the] misrepresentations-clergy and active members of religious organizations, elderly persons investing life savings in the venture, laborers, and generally those elements of society unsophisticated in the ways and means of financial enterprise. * * *
 
 
 5
 United States v. Smallwood, 443 F.2d 535, 537 (8th Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971).
 
 
 6
 Before the maturity date of each note, the noteholder was contacted by the corporation or its representative and advised that the note was about to mature. The noteholder was given a statement of his account. He was advised that he had an option of redeeming the note (i. e., receiving the principal amount and accrued interest), or accepting a new note either for the face amount of the old note, plus the accrued interest, or simply for the face amount of the old note and receiving the accrued interest in cash. Exercise of the option was left completely to the noteholder. Prior to the receivership, noteholders were always paid when they chose to redeem their notes or collect their accrued interest. Over three million dollars was paid to the noteholders during the corporation's existence. Approximately onethird of this represented payments of principal while the other two-thirds was attributable to accrued interest.
 
 
 7
 The corporation, in fact, was not engaged in any highly profitable business. Indeed, its proceeds, other than from these loans, were very meager-less that fifty thousand dollars for each of the three fiscal years beginning with September 30, 1965. Rather, the corporation was engaged in a Ponzi-type scheme, see, Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), under which the corporation was obtaining more loans to pay off previous loans; and all the while, the officers were illegally diverting a substantial portion of the corporation's proceeds to their own uses.[2]
 
 
 8
 As a result of the repayments and diversions, there was only 1.5 million dollars in corporate bank accounts when it was placed in receivership. The receiver and trustee for the estate of the bankrupt gathered an additional 1.5 million dollars by recovering various assets which the officers acquired with the funds they diverted from the corporation. Noteholders, however, have filed nearly 2,900 claims against the bankrupt totaling 12.3 million dollars of which 4.4 million dollars represents principal due them. In addition, the United States Government filed a claim of 1.9 million dollars against the bankrupt for unpaid income taxes and interest for the tax years 1965-1968.[3] This is the claim at issue here.
 
 
 9
 The trustee objected to allowance of the government's claim. Hearings were held by the Referee in Bankruptcy; he denied the claim; and his denial was affirmed by the United States District Court for the Eastern District of Missouri, 355 F.Supp. 76, 358 F.Supp. 889.
 
 
 10
 The Referee held that the taxpayer corporation did not realize taxable income on the loans received by it. He took note of the broad interpretation which Section 61(a) of the Internal Revenue Code of 1954 has been given by the Supreme Court, and proceeded with the understanding that the controlling factor in classifying the receipt of money as "income" is whether an "economic benefit" accrued to the taxpayer by the receipt of the money. He further observed that loans are not "income" as they carry with them a "consensual recognition * * * of an obligation to repay." See, James v. United States, 366 U.S. 213, 219, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961). He found that in the instant case, the transactions were bona fide loans as between the corporation and the lenders. The Referee stressed that the record indicated that both the bankrupt and the lenders considered the monies received to be loans and subject to repayment. He noted that the bankrupt: (a) honored all requests for repayment, (b) made substantial payments, and (c) had a considerable bank balance at the time of receivership. He also emphasized that the corporation was but a conduit for the officers' fraud and itself received no benefit from the receipt of the monies. Finally, he concluded that it would be "unthinkable" to tax the bankrupt on its receipt of these funds and thereby substantially impair the innocent lenders ability to recover on their loans.
 
 
 11
 The District Court affirmed the Referee's decision and adopted his opinion. It stated:
 
 
 12
 1. All loans were repaid when requested of the Bankrupt with interest.
 
 
 13
 2. Both the Bankrupt and the lender considered these as loans.
 
 
 14
 3. Sufficient cash was kept by the corporation to repay the loans as requested.
 
 
 15
 4. There was no intent by the Bankrupt's officers to convert the money until it was actually taken from the corporation for their own personal use.
 
 
 16
 5. The tax award to the Government is due by the individual officers to the extent that money was taken and embezzled by those officers.
 
 
 17
 On this appeal, the government maintains that the principles of James v. United States, supra, are controlling and that they dictate a reversal. It argues that because throughout the operation of the fraudulent scheme the bankrupt could not have possibly repaid all the monies received by it in the form of loans, the bankrupt could not and did not intend to repay the loans and, therefore, there was no "consensual recognition * * * of an obligation to repay" on the bankrupt's part and the receipts were "income" to the bankrupt. See, James v. United States, supra, at 219, 81 S.Ct., at 1055. See also, United States v. Rochelle, 384 F.2d 748 (5th Cir. 1967), cert. denied, 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135 (1968). It urges that the history of repayments by the bankrupt does not support the "loan" characterization, but rather supports the view that the repayments were made to keep the plan afloat. The government finally argues that the corporation cannot be separated from its principals and that benefit to the principals must be construed as benefit to the corporation.
 
 
 18
 We do not agree that James is controlling here. In James, union officials were convicted for willfully attempting to evade income taxes. They embezzled funds from the union and from an insurance company with whom the union did business and failed to report the embezzled funds as taxable income. The Supreme Court, in a six-three decision with no opinion commanding a majority, held that the embezzled funds constituted taxable income to the officials because they had acquired the funds without an express or implied obligation to repay them and because they derived readily realizable economic benefits from them. James v. United States, supra. Here, the record supports the Referee's findings: that there was an express agreement to repay the loans with interest; that many payments on principal and interest were made; and that the proceeds of the loans were used for the benefit of the individual officers and not the corporation.
 
 
 19
 We recognize that the taxpayer was unable to repay all of the loans with interest because of the pyramiding nature of the scheme and the officers' embezzlements. We also realize that some of the payments on principal and interest were made to keep the scheme afloat. But we are unwilling to disregard the Referee's factual findings and hold, as a matter of law, that these factual circumstances operated to convert the loans into taxable income at the corporate level.
 
 
 20
 In our view, James and more recent decisions of the Second and Fifth Cir cuits require that Smallwood, Lay and Conell recognize the sums embezzled by them from the corporation as taxable income. The decisions do not require that the corporation include all sums loaned to it as taxable income.[4]
 
 
 21
 The government's arguments for extending James have a certain sophistic appeal, but we cannot accept them. As a practical matter, no taxable income was realized by anyone until Smallwood, Lay and Conell diverted funds to themselves. At that point, the funds embezzled became taxable income to them. Until then, the funds in the hands of the corporation were nothing more than loans and were treated as such by the corporation and the lenders.
 
 
 22
 We fully understand the government's underlying reason for wanting to extend the rationale of James to this case and others like it. Its chances of gaining additional tax revenues at the expense of defrauded lenders would be substantially increased. We are unwilling to make this extension. Congress can make it if it wishes, but James does not require that we make the extension and we see no valid reason for doing so here.
 
 
 23
 Affirmed.
 
 
 24
 ROSS, Circuit Judge (concurring).
 
 
 25
 I concur in the result reached by Judge Heaney and in the reasoning he uses to reach that result. I am not convinced, however, that the financial transactions between the bankrupt corporation and the "investors" were actually loans. In my opinion, the funds secured from these individuals were obtained as part of a fraudulent scheme and the principal officers of the bankrupt corporation knew that the "loans" would not be repaid in full, with interest. Under a strict interpretation of James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the money obtained from these "investors" could be considered income to the bankrupt corporation.
 
 
 26
 James v. United States, supra, was decided by a divided court with five separate opinions. It involved a situation in which an individual embezzled money from his employer and did not report it as income for the purpose of taxation. He was charged in a criminal indictment with willfully attmepting to evade income taxes and was convicted. The question of whether the Government should be entitled to its taxes on the embezzled funds even if it meant the victim would not recover was not a direct issue in the case and was not discussed in the majority opinion. However, Justice Black emphasized in his dissent:
 
 
 27
 [S]ubjecting the embezzled funds to a tax would amount to allowing the United States "a preferential claim for part of the dishonest gain, to the direct loss and detriment of those to whom it ought to be restored." Id. at 227, 81 S.Ct. at 1060 (citation omitted).
 
 
 28
 Perhaps the Supreme Court will reexamine its holding in James v. United States, supra, and refine it in the light of the facts of this case. If it really intended to hold that the Government should be able to assert its claim (for taxes) to the money which has been wrongfully taken from the victims of a fraud, in preference to the claims of the victims, it should have the opportunity to do so in a case which squarely presents the issue. This is such a case.
 
 
 29
 STEPHENSON, Circuit Judge (dissenting).
 
 
 30
 It is my view that James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), is controlling in this case. The funds obtained by the bankrupt through the fraudulent scheme perpetrated by its officers constituted taxable income to the corporation.
 
 The Referee in Bankruptcy found:
 
 31
 Unquestionably, as these facts show, the bankrupt was the borrower in a Ponzi-scheme, [footnote omitted] by which money was borrowed by it, from unsuspecting lenders, upon false representations as to its business activity and upon false representations as to its ability to repay the borrowed monies plus interest at the promised rates.
 
 
 32
 It is abundantly clear that the corporation obtained funds under false pretenses from innocent victims. Under James, this was taxable income. To treat the funds as loans to the corporation and income only to the officers when the funds were diverted to their personal use is to ignore the well-established law that knowledge, intent and acts of corporate officers acting within the scope of their authority are imputable to the corporation. The funds diverted to the private use of the corporate officers may well be regarded as income to them, but first it was income to the corporation. Burger v. United States, 262 F.2d 946, 956 (8th Cir. 1959). The mere fact that the bankrupt corporation realized no real economic benefit from the loans does not alter its tax liability. Moline Properties v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).
 
 
 33
 The issue of whether the government's tax claim should have priority over rights of the victims to recoup their losses is not before us. Admittedly, the results may be harsh. If such is the case, the remedy lies with Congress.
 
 
 
 [1]
 Included in the misleading and false representations were:
 * * * [S]tatements that each investment was assigned to a specific "project" identified by number, that the business projects engaged in consisted of buying and reselling government surplus and distressed merchandise at huge profits, when, in fact, the amount of Diversified's business in distressed merchandise was infinitesimal compared to the total sum received from investors. * * *
 United States v. Smallwood, 443 F.2d 535, 536-537 (8th Cir.), cert. denied, 404 U.S. 853, 93 S.Ct. 95, 30 L.Ed.2d 93 (1971).
 2 * * * Instead of using the funds so obtained to purchase surplus merchandise for resale, large sums were wrongfully and unlawfully diverted to purchase personal property consisting of jewelry, objects of art, luxury automobiles and expensive yachts which were taken possession of in large part by * * * Smallwood and Lay. * * *
 Id., 443 F.2d at 537 (Footnote omitted.)
 
 
 [3]
 The corporation did not file income tax returns for the years at issue. The alleged income tax deficiencies were based on the bank deposits of the bankrupt during each of the tax years. The government claimed that the receipts manifested by these deposits constituted gross taxable income. This, in turn, was reduced in the computation by payments to noteholders of both principal and interest which were treated by the government as ordinary and necessary expenses of keeping the fraudulent scheme afloat. See, Moore v. United States, 412 F.2d 974, 977 (5th Cir. 1969)
 
 
 [4]
 The Second and Fifth Circuits have held in cases where transactions were formally cast as "loans" but where either an intent to repay was lacking, United States v. Rosenthal, 470 F.2d 837 (2nd Cir. 1972); United States v. Rosenthal, 454 F.2d 1252 (2nd Cir.), cert. denied, 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 134 (1972); United States v. Rochelle, 384 F.2d 748 (5th Cir. 1967), cert. denied, 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135 (1968), or a consensual agreement between the lender and the swindlerborrower was absent, Moore v. United States, supra, that the money received was taxable income to the swindling borrower. In all of these cases but one, the Courts were concerned solely with the individual wrongdoer and found that he had derived economic benefit from the funds obtained. In the second Rosenthal decision, the Court affirmed the conviction of Rosenthal for both corporate income tax evasion, in his role as principal officer and sole owner of the corporation, and for individual income tax evasion. It did not discuss its reasons for so holding