Sidney W. Fairchild v. Commissioner.
Fairchild v. Commissioner
Docket No. 3584-67.
United States Tax Court
T.C. Memo 1970-329; 1970 Tax Ct. Memo LEXIS 30; 29 T.C.M. (CCH) 1505; T.C.M. (RIA) 70329; November 25, 1970, Filed. *30 Held: The funds received by petitioner from another in each of the years 1960 through 1964 were not loans in that petitioner received the money in each of those years without any intention of repaying it. Therefore, petitioner received taxable income in the amount of money received in each of the years 1960 through 1964. Emanuel Liebman, for the petitioner, John G. Kissane, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the Federal income tax due from the petitioner as follows: Year
Deficiency
1960
$39,159.90
1961
51,588.00
1962
51,192.00
1963
39,387.00
1964
24,153.00
The respondent has conceded the fraud issue for all the years in question, and the only issue presented for decision is whether the following amounts *31 constituted taxable income under section 61 [1] in the indicated years: Year
Amount
1960
$67,305.00
1961
95,550.00
1962
95,000.00
1963
78,300.00
1964
59,300.00
The evidence consists of a stipulation of facts with exhibits attached and oral testimony and exhibits received at trial. The stipulations of facts are incorporated herein by this reference. The petitioner, Sidney Fairchild, was a legal resident of Collingswood, New Jersey, at the time his petition in this case was filed. The Federal income tax returns of Sidney Fairchild (hereinafter referred to as "petitioner") for the calendar years 1960 through 1964, inclusive, were filed with the district director of internal revenue at Camden, New Jersey. Petitioner is the president and sole stockholder of Custom Paint and Chemical Co., Inc. (hereinafter referred to as "Custom") and Polymer Coatings, Inc. (hereinafter referred to as "Polymer"). Petitioner was also the sole stockholder in or sole proprietor of the following business entities: Penn-Jersey Waterproofing Co., Inc., Petroleum *32 Associates, Industrial Factors, Inc., Commercial Industrial Institute, Consumer Construction Co., Southern Construction Co., and Surety Finance Co. [2] 1506 Custom remains in existence as a corporation, but it has no payroll and is not a going business at the present time. Polymer, which operates "under the same roof" as Custom, has one employee in addition to petitioner, but it is no longer engaged in any manufacturing operations. In the course of its existence, Custom has never shown a profit. Polymer was formed as a successor to Custom in order to secure more adequate financing for the business. Petitioner has very little formal education and none whatsoever in chemistry. Petitioner's practical experience in the chemical field was as a salesman, however, he has worked extensively in the paint and chemical business since 1940 and is self-taught in the more sophisticated aspects of the business. Petitioner reported the following amounts as income in the indicated years: Year
Income
1960
$1,200
1961
5,200
1962
5,200
1963
5,200
1964
5,200
*33 Petitioner first met Dr. Robert A. Cooper (hereinafter referred to as "Dr. Cooper"), a medical doctor and prominent surgeon in Camden, New Jersey, in 1954. Petitioner's initial contact with Dr. Cooper was for the purpose of selling oil leases to him. Dr. Cooper purchased such oil leases from petitioner for $3,000. The leases proved to be worthless. In 1954, petitioner also informed Dr. Cooper of his chemical business and indicated that between $9,000 and $15,000 was needed to develop it. In making the initial advancements to petitioner, Dr. Cooper relied on petitioner's representations as to the nature and quality of the products which had been or were being developed by petitioner. In ensuing years, Dr. Cooper continued to make advancements to petitioner. Petitioner received from Dr. Cooper the following amounts in the years indicated: Year
Amount
1954
$ 6,900.00
1955
72,202.00
1956
46,245.00
1957
67,493.00
1958
69,060.00
1959
None
1960
67,305.00
1961
95,550.00
1962
[3] 95,000.00
1963
[4] 78,300.00
1964
59,300.00
1965
68,700.00
1966
30,400.00
1967
41,900.00
1968
20,600.00
1969
26,384.00
*34 The total amount advanced by Dr. Cooper to the petitioner during the period of 1954 through 1969 was $845,339. [5] Of this amount, $395,455 was advanced to the petitioner during the calendar years 1960 through 1964, inclusive. All of the advances were in the form of cash. No security was taken by Dr. Cooper, and there has been no repayment of the advances except in minimal amounts. The advancements were generally sought on an "emergency" basis to be used for payment of payroll, salesmen's commissions and accounts payable. Any questions which Dr. Cooper had concerning the business or the development of the process were answered by petitioner. However, Dr. Cooper never went to the plant and never examined the books of account of the business, choosing instead *35 to rely entirely on the information supplied by petitioner. He also did not receive any written annual reports. As time passed, the funds were generally given in response to petitioner's representations that progress in the development of a marketable product and the business made the success of the venture a foreseeable possibility. These representations were coupled with predictions that if additional capital was not obtained, the business would fail with the resulting loss of Dr. Cooper's entire investment. Dr. Cooper expected that petitioner would "paint" a more positive than negative picture when he was asking for money. 1507 The original oral agreement between petitioner and Dr. Cooper was that in return for the funds advanced, Dr. Cooper would receive a 50 percent share of the profits from the venture, if any. At the time of the original agreement, there was no intention on Dr. Cooper's part that the funds advanced be considered loans to the petitioner. As the amounts of money advanced became substantial, Dr. Cooper became alarmed, and the petitioner and Dr. Cooper decided to cast the advancement transactions in the form of loans so that in the event the business *36 was unsuccessful, Dr. Cooper would have the opportunity to attempt to take a tax deduction. This transformation of the advancements into the form of loans took place in a few months or approximately 1 year from Dr. Cooper's initial advancement to petitioner for the development of the chemical business. In his income tax return for the year 1959, Dr. Cooper attempted to take a bad debt deduction in the amount of $263,000 for the funds advanced to petitioner in the previous years. This claim of Dr. Cooper was not allowed by the Internal Revenue Service. Dr. Cooper would not have made any advances during the calendar years 1960 through 1964 if the advances had not been cast in the form of loans, i.e., if petitioner had not been willing to sign the notes as evidence of the debt. During these years, Dr. Cooper considered this method as the only way in which he could hope to be repaid. When the advances were cast as loans, Dr. Cooper received as evidence of the indebtedness monthly notes handwritten by himself and signed by petitioner. There was never any written agreement relating to the sharing of profits between petitioner and Dr. Cooper. The notes evidenced a promise to repay in *37 12 months at 6-percent interest. The notes are negotiable and are unconditional and legally enforceable obligations to repay. There were no restrictions on the use of the funds although it was understood between petitioner and Dr. Cooper that a very "large percentage" of the advances was to be used for the development of a marketable product on which the success of the venture was contingent. It was also understood that some of the funds would be used for petitioner's personal living expenses. During the years in question, petitioner's total living expenses were between approximately $8,000 and $10,000 per year. Dr. Cooper stated that there was at all times an understanding between petitioner and himself that repayment was to be made on the advancements. Dr. Cooper regarded the advances as loans and expected repayment with interest. His hopes as to there ever being actual profits have diminished over the years. Nevertheless, following repayment of the advances, he expected to share in the profits of Custom as the original oral agreement between the parties in relation to the sharing of profits did not change despite the fact that the transactions were cast in the form of loans *38 and notes given. [6]
*39 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Petitioner's testimony indicates that Southern Construction Co. was not in existence during the years herein in question.↩
3. The amount of $95,000 for 1962 was the amount provided for in the stipulation of facts. We adhere to this stipulated amount for purposes of our decision, but Dr. Cooper testified at trial that based on his own records, the amount he gave to petitioner in 1962 was $96,500. ↩
4. The amount of $78,300 for 1963 was the amount provided for in the stipulation of facts. We adhere to this stipulated amount for purposes of our decision, but Dr. Cooper testified at trial that based on his own records, the amount he gave to petitioner in 1963 was $79,300.↩
5. This amount is the total of the yearly sums listed above as having been advanced by Dr. Cooper to petitioner during the period of 1954 through 1969. We accept this amount as the total of the funds given by Dr. Cooper to petitioner during the period of 1954 through 1969, however, Dr. Cooper testified at trial that based on his own records, the total amount he gave to petitioner during this 16-year period was $859,739.↩
6. As time passed and other individuals invested in the business, Dr. Cooper was uncertain as to the percentage of profits he would receive after repayment of the advances.e Petitioner testified that the advances were loans, that he intended to repay them, and that he considered himself obligated at all times and under all circumstances to repay Dr. Cooper. Dr. Cooper knew that petitioner could not repay any of the advances unless profits resulted from the development and marketing of a product. This was particularly true for the year 1960 and the years subsequent thereto. However, at all times in question, Dr. Cooper continued to make advances to petitioner. He did so, even though he sometimes felt that the business was a hopeless venture, because he believed that by doing so he would in some way be able to get a portion of his money back. In his own mind, Dr. Cooper regarded all of these advances as loans and always insisted on petitioner's promissory notes to cover all funds advanced. The advances to petitioner from Dr. Cooper were cast as personal loans and were not given directly to Custom. Petitioner then established loan accounts between himself and his controlled corporations, Custom and Polymer. Some of the funds advanced by Dr. Cooper were placed in the corporate bank accounts and were credited on the corporate books as a loan from petitioner. Some of the funds were used for miscellaneous purposes without ever being deposited in the loan account. These purposes included payment of payroll expenses, cash payments to salesmen, and other expenses of the business. 1508 Finally, some of the funds advanced were used for the petitioner's personal needs. Part of the amounts used for these needs came from funds not deposited in the loan account and part was withdrawn from the deposits made to the corporate accounts. The amounts of the withdrawals for petitioner's personal needs were minimal in amount. The net amounts of money received from Dr. Cooper which did not go through the corporation loan accounts were: Year
Amount
1960
$27,772.02
1961
35,134.34
1962
29,654.82
1963
22,135.80
1964
21,087.40
Petitioner testified that where the advances from Dr. Cooper were used for the business but were not placed in the loan accounts, the corporate books would still reflect such expenditures, unless omitted because of an oversight on the part of Custom's bookkeepers, in that such amounts had to be accounted for in order to balance the corporate accounts. Several other persons were also persuaded to advance funds to petitioner for use in the business. Dr. Robert W. Harris, a chemical engineer, advanced $72,856.75; Charles F. Zeller advanced $15,600; and W. C. Evans advanced $6,000. The transactions in which these funds were advanced by these parties were cast in the form of loans. In return for his advancements, Dr. Harris was to receive either a 10 or 20 percent interest in the business. In addition, he worked in the business in an attempt to develop and perfect the product which was the key to the success of the venture. Dr. Harris received corporate notes with personal endorsements, but he has not been repaid except possibly in minimal amounts. Mr. Zeller received legally enforceable personal notes of petitioner in the exchange, but he has not been been repaid any of the funds he advanced. Mr. Evans also received notes in exchange for the advances, but aside from a nominal repayment of $200, he has not been repaid by petitioner. Ultimate Finding of Fact The amounts which petitioner received from Dr. Cooper in each of the years 1960 through 1964 were not loans in that petitioner received the money in each of those years without any intention of repaying it. Opinion The only question for decision is whether the advances made by Dr. Cooper to petitioner constituted loans or constituted income taxable to the petitioner in the years when they were received. Respondent has determined that the amounts which petitioner received from Dr. Cooper in the calendar years 1960 through 1964 were taxable income to petitioner. His determination is presumptively correct, and the burden is upon petitioner to prove by a preponderance of the evidence that it is wrong. In determining whether the advances to petitioner were loans, this Court is not bound by the manner in which the transactions were arranged. The substance of a transaction controls over its form, and in determining the substance of the transactions before us, we shall analyze all the facts and circumstances surrounding the entire course of the dealings between petitioner and (C.A. 5, 1967); and (C.A. 6, 1955), certiorari denied . While there are numerous factors which can be weighed in determining for income tax purposes the true nature of a purported loan, there is one essential element without which a transaction cannot be established as a loan. The parties must have entered into the transaction with the intention that the money advanced be repaid. (C.A. 3, 1963); Spheeris v. 928 (C.A. 7, 1960), certiorari denied ; (C.A. 2, 1944), certiorari denied ; and . Furthermore, the obligation to repay must be unconditional and not contingent on some future event. ; (C.A. 7, 1956), affirming a Memorandum Opinion of this Court; ; and . In this case, there is no claim by the lender that he was the victim of fraud or 1509 extortion, and it is clear that the obligation to repay the advances was unconditional and not subject to any future contingencies. However, the record as a whole establishes a pattern of conduct by the petitioner from which the only reasonable inference is that he never had any intention of repaying the advances made by Dr. Cooper during the years in question. Over a period of 16 years from 1954 through 1969, including the years herein in question, petitioner received a total of $845,339 from Dr. Cooper. During the same 16-year period, he also received advances cast in the form of loans from several other persons. In each instance, there has been only minimal or token payment of the purported principal or interest or no repayment at all. This failure of repayment over a 16-year period is a clear indication that petitioner received the advances in each of the years in question with absolutely no intention of repaying them. In addition, petitioner did not introduce any substantive evidence at trial, other than his own self-serving testimony, to demonstrate his intention to repay the advances. He did not introduce any evidence as to the business activity of Custom or Polymer, as to the technical aspects of the development of the chemical formula, as to marketing activities of the firm, and as to the general business conditions existent during the period in question. Since petitioner has the burden of proof, we think that his failure to introduce witnesses to corroborate his testimony as to his intention to repay warrants an adverse inference being drawn. . On this basis and considering the record as a whole, we have found as a fact that petitioner received the advances made by Dr. Cooper in each of the years in question without any intention of repaying them. As a consequence of this finding, the advances cannot be considered as loans. Having made this finding of fact, it follows as a matter of law that the advances in question constituted taxable income to petitioner in the years they were received. Amounts received by a taxpayer are taxable income to him when, as here, he has such control over such amounts "that, as a practical matter, he derives readily realizable economic value from" them. , and see also . Decision will be entered under Rule 50. ↩