355 F.Supp. 76 (1973)
In the Matter of DIVERSIFIED BROKERS COMPANY, INC., Bankrupt.
No. 69 B 569.
United States District Court, E. D. Missouri, E. D.
February 14, 1973.
John A. Nooney, Trustee, Clayton, Mo., Stuart Symington, Jr., and Sanford S. Neuman, St. Louis, Mo., for John A. Nooney.
John J. McCarthy, Chief, General Litigation Section, Tax Div., Washington, *77 D. C., and Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for claimant.
William McNamara, Office of Chief Counsel, Internal Revenue Service, St. Louis, Mo.

MEMORANDUM
MEREDITH, Chief Judge.
The United States has filed a tax claim against the bankrupt estate for income taxes of the corporation for the years 1965, 1966, 1967, and 1968, plus interest at the rate of six percent. The total amount of the claim, plus interest, amounts to approximately $2,000,000.00. The trustee filed objections to the claim and after hearings conducted by the Referee in Bankruptcy, the claim was denied and the objections of the trustee were upheld on September 19, 1972.
The United States has filed its petition for review and the Referee has filed his certificate.
The question for determination is the correctness of the Referee's order of September 19, 1972, denying petitioner's claim No. 6, manifesting his conclusion that the bankrupt's receipt of monies from its lenders, where the bankrupt was utilized as a borrower by its officers in a Ponzi-type scheme, does not constitute taxable income within the meaning of section 61(a) of the Internal Revenue Code.
This Court affirms the decision of the Referee in Bankruptcy, and further adopts the well-reasoned and detailed memorandum opinion of the Referee in Bankruptcy, dated September 19, 1972, as the opinion of this Court.

MEMORANDUM OPINION
Pending for determination is the trustee's Objections To Claim, filed April 27, 1970, to Claim No. 6, filed April 16, 1970, as a tax (income) priority claim, by the United States of America. On September 19, 1970, the trustee filed his Supplemental Objection To Claim. Hearing was had upon the objections, and upon the claim, in September, 1970, the matters in issue having been finally heard and submitted on September 16, 1970, with leave to file briefs and other matters thereafter.
The trustee does not, in either of his pleadings to Claim No. 6, object to its allowance on the ground that the claim was not timely filed. Nevertheless, in part I of his post-hearing brief, he argues such. The Government, in its reply brief, meets the argument, without complaint that the objections did not challenge the claim for that reason. Further, hearing upon the objections and upon said claim proceeded as though the claim had been challenged on such basis.
As stated, Claim No. 6 was filed on April 16, 1970. It is denominated "Amended Supplemental No. 1 to Proof of Claim dated May 2, 1969".[1] Claim No. 6 describes, as the alleged tax liability of the bankrupt:

 "Corporation IncomeYear Ending
 12-31-65 5,259.69
 Interest to 3/28/69 957.98
 Corporation IncomeYear Ending
 12-31-66 146,126.31
 Interest to 3/28/69 17,847.43
 Corporation IncomeYear Ending
 12-31-67 519,711.25
 Interest to 3/28/69 39,293.27
 Corporation IncomeYear Ending
 12-31-68 1,158,189.06
 Interest to 3/28/69 2,475.07"

The bankrupt was adjudicated a bankrupt by order of this District Court entered on April 22, 1969. The first meeting of creditors was held on June 6, 1969. The last day for the filing of claims under Section 57n of the Bankruptcy Act, Sec. 93(n), Title 11 U.S.C., was December 6, 1969, unless, as permitted by the provisions of that Section, the time for the filing of claims by the United States was extended. Prior thereto, and on November 28, 1969, an order was entered *78 extending the time, for the filing of tax claims by the United States, to and including February 4, 1970.
On January 29, 1970, within such extended time, the United States filed its Claim No. 5, denominated "Supplemental No. 1 to Proof of Claim dated May 2, 1969". This claim describes, as the alleged tax liability of the bankrupt:

 "Corp. Income F-9-30-66 137,270.46
 Interest to 3/28/69 18,824.99
 Corp. Income F-0-30-67 455,522.26
 Interest to 3/28/69 35,137.79
 Corp. Income F-930-68 941,094.40
 Interest to 3/28/69 16,127.52"

Aside from the obvious difference in the claimsClaim 6 embracing income taxes, allegedly due, calculated on a calendar year basis and Claim 5 embracing income taxes, allegedly due, on a fiscal year basisthe method of arriving at a taxable income figure for the respective years differs with the claims. Claim 5 is primarily based upon a determination that bankrupt's "loans payable" account was to be used as evidence of its gross income; whereas, Claim 6 is based upon a determination that bankrupt's deposits, into the North County Bank, reflecting its receipts of money, was to be used as evidence of its gross income. (See, & compare, U. S. Exhibits JJ & R, with U. S. Exhibit KK). This difference is of no substantive consequence, in my judgment, in respect of the trustee's timeliness objection.
The theory of the Government's imposition of income tax liability in each instance is the same: that is, that the money received by the bankrupt, pursuant to its scheme,[2] is to be considered income for income tax purposes. Only the method of determining the amount of money received differs.
Amendments, of claims, which are filed after the expiration of the statutory period provided for by the Act are not barred so long as such amendments do not seek to assert an entirely new, different, separate and distinct claim to that which was timely asserted. Hutchinson v. Otis (1903) 190 U.S. 552, 23 S.Ct. 778, 47 L.Ed. 1179, In re Faulkner (8 Cir., 1908) 161 F. 900. Such amendments which merely increase the amount of the claim are not barred. Menick v. Hoffman (9 Cir., 1953) 205 F.2d 365; Continental Motors Corp. v. Morris (10 Cir., 1948) 169 F.2d 315; Industrial Commissioner of New York v. Schneider (2 Cir., 1947) 162 F.2d 847; In re Parchem (D.C.Minn., 1958); Nordbye, J.) 166 F.Supp. 724; In re Morgen Drug Co. (D.C.N.Y., 1941) 42 F.Supp. 345.
In Menick v. Hoffman, supra, the Court permitted the Government to file and prove an amended claim, not timely filed, where the amended claim included income taxes which had not been previously asserted, and where the claim timely filed embraced only withholding and social security taxes, saying the amendment did not change the basic ground for recovery set out in the earlier claim, and by it an entirely new, different, separate and distinct claim was not being asserted.
The trustee cites only In re Buckeye Die Tool Co. (Ref.Opinion, 1952, E.D. Mo.) 52-2 U.S.T.C. para. 9450. There, Referee O'Herin of this District disallowed an amended claim for taxes where the amount of the (withholding) taxes timely asserted was sought to be increased. It is clear that Referee O'Herin disallowed the amended claim, as it sought to increase the taxes timely asserted, only because of the local Bankruptcy Rule, Rule XIV(b), then in existence, which precluded amendments to claims where the amendments were not filed within the time fixed for the filing of claims and where the amendments sought to increase the amount of the claim. Such Rule no longer exists, and Buckeye no longer serves as a useful precedent.
I do not perceive that Claim 6 asserts such an entirely new, different, *79 separate and distinct claim from that asserted by Claim 5 so as to be barred by Section 53n, supra. Each asserts a claim for unpaid income taxes, albeit different tax periods are embraced and a different method is used in determining the amount of gross taxable income realized by the bankrupt. This contention is ruled against the trustee.

. . . . .
The Government contends that Claim No. 6 is to be sustained on the theory that the bankrupt engaged, by the acts of its officers and employees, in a scheme to receive money, in the form of loans, from unsuspecting persons, upon misrepresentations to them as to its activity and as to its ability to pay the borrowed monies and exorbitant rates of interest and upon the promise to pay exorbitant rates of interest; that throughout the period of the scheme the bankrupt could not repay the monies received; that, thereby, it could not and did not intend to repay those monies; and that, thus, the receipt of those monies constitute the receipt of gross income.
The trustee contends that the receipts of money, by the bankrupt, upon which Claim No. 6 is based, were merely monies received as loans from such unsuspecting lenders, and that such loan-receipts do not constitute taxable income.
The bankrupt was incorporated, as a Missouri corporation, on November 12, 1965. The incorporators were Donald Smallwood, Betty Smallwood, his wife, and Roy Lay. These incorporators were its only directors[3] and stockholders, Donald Smallwood owning 29 shares of its stock; Betty Smallwood, 1 share; and Roy Lay, 20 shares. Each share has a stated par value of $10. Fifty of such shares were authorized to be issued prior to the commencement of business, and were issued in the numbers and to the shareholders as stated. Throughout its existence, Donald Smallwood, was its president, and Roy Lay its vice-president, and one Harold F. Conell its treasurer. Betty Smallwood was its secretary until November 17, 1967; Roy Lay served as such thereafter. The salaries of such officers was to be such as fixed from time to time by the Board of Directors.
The bankrupt was formed as a general business corporation, to buy and sell, lease, and deal in all types of property and to engage in and perform services, generally. Very little of such business activity was engaged in. Although the bankrupt deposited sums totaling in excess of $6,900,000 into its bank account in the North County Bank & Trust Co., in 1965 through 1968, its sales were less than $50,000 during each of the fiscal years between September, 1965, and September, 1968. The bankrupt made 5 loans[4] during its existence to other individuals or entities, but the loans were small, one ($5,000) loan bearing a return of 8% per year interest, another ($5,000) loan bearing a return of 12% per year interest. The largest of such loans is a $16,000 loan; the greatest rate of interest promised to the bankrupt by these borrowers is 12% per year. Also, the bankrupt expended monies in the purchase of certain real estate, title to which at bankruptcy was found to be in persons other than the bankrupt. Evidence of bankrupt's interest in other possible business deals was discovered, but very few were found to have been consummated. None produced income to the bankrupt.
The principal and almost exclusive source of bankrupt's receipts, during its entire existence, is the money received *80 from lenders to whom interest at exorbitant rates was promised by the bankrupt. Approximately 4,000 persons loaned the bankrupt money during the tax years involved. They were promised varying rates of interest, from 25% to 100%, upon promissory notes maturing in three months, four months, some in six months, others in a year.
The promise of the payment of such rates of interest, and the actual payment of interest at such rates, induced people to loan money to the bankrupt. Prospective lenders were also induced to lend money to the bankrupt by misleading and false representations made by bankrupt's officers: that each loan was assigned to a project; that bankrupt's projects related to certain contracts; that its contracts related to and its business consisted of the buying and reselling of government surplus, and other surplus goods, of distress merchandise, of salvaged goods, of damaged goods, of discontinued items, and of goods acquired from bankrupt companies; that huge profits were being made from bankrupt's sale of such goods; that the rate of interest the bankrupt was able to pay varied only with the variation in such profits; that the bankrupt was able to pay a high rate of interest because of the huge profits it was making; and that the bankrupt wouldn't buy merchandise unless they had a ready buyer for it. On at least one occasion, Smallwood represented that the bankrupt owned patent rights on an aerosol spray, which the bankrupt was to sell in big quantities to an airline. On another occasion, he represented that the bankrupt owned stocks, bonds and securities, as a hedge against bad times, to protect its lenders.
Representatives (denoted as Field Representatives in the parties' Stipulation of Facts) were recruited by the bankrupt's officers, to procure loans from people. Such representatives were paid a commission of 3%, or 5%, on the gross amount of a loan procured as a result of their activities. Ministers in the Pentecostal Church of God were utilized in this fashion. The representatives usually were lenders to the bankrupt, and were told, by the bankrupt's officers, to make the same representations to their prospective lenders as were made to them; and, such representations were so made. Bonuses and expense-paid vacation trips were promised these representatives, from time to time, to stimulate their procurement of additional loans. These loans of additional monies were to be procured in order allegedly for the bankrupt to handle its contracts. Government's Exhibit AA is typical of letters sent to such representatives:[5]
 October 17, 1966
 Mr. Ed Koehler
 2907 Magnolia Avenue
 St. Louis, Missouri 63118
Dear Mr. Koehler:
A few lines to let you know where our present investment program stands.
On Saturday, October fifteenth, here at the office we had a local representative meeting. At this time we outlined to them our next three months program which will end January Fifteenth, nineteen sixty seven. I explained to them that a goal of thirty thousand dollars over the next three months was set for each representative. All representatives who reach this goal would be entitled, he and his wife, to an all expense paid trip to Jamaica or other points within the United States. The company has agreed to pay for the trips at the sum of one thousand dollars per representative. The reasoning behind this is that we have over three hundred fifty thousand dollars worth of new business. Starting in January there is a project that the company is anticipating taking on. This project will use the better portion of all available company *81 funds and will be for a longer period of time. In order not to neglect the people we have done business with in the past it will be necessary for us to raise the other three hundred fifty thousand dollars. If every representative is able to reach his or her goal then this will present no problem. The rate of interest that would govern the next three months would normally fluctuate between fifteen and thirty percent, but in order for everyone to have equal opportunities the fifteen percenters has been raised and the thirty and twenty five have been lowered, and the percentage to be offered will be twenty one percent across the board. From time to time we anticipate new contracts that may run in a higher percentage bracket. When and if these come each representative will be notified at the same time. Please give this your immediate attention. Each representative will have a scale chart posted in the office that will run from one thousand to thirty thousand dollars, and their records of progress will be shown on these charts.
 Sincerely yours,
 Harold Conell
 Executive Secretary
 HC/etr
The representations, referred to hereinabove, were false, as bankrupt's sales were infinitesimal compared to the monies received by it from its lenders. In 1965, it received $46,927.25 from its lenders; in 1966, it received $652,671.34; in 1967, it received $1,978,296.04; and in 1968, it received $4,539,563.05. It also received $65,289.03, in addition, from its lenders, during its existence.[6] Its sales, as previously stated, were less than $50,000 for each of the three fiscal years beginning September 30, 1965.
Bankrupt's lenders were not aware of the falsity of the representations made by bankrupt's officers and by its field representatives. Ministers were used, as stated previously, to proclaim bankrupt's purported activities, and their apparent credibility lent added credence to the representations. Many loans were made to the bankrupt upon the reliability of the representatives, and the bankrupt's systematic payments to its lenders (as those payments are disclosed infra), the fact of which was proclaimed also to prospective lenders, was further proof to such lenders of the safety of their loans.
Instead of using the monies received from its lenders to purchase merchandise for resale, large sums were wrongfully and unlawfully diverted by the bankrupt's officers (1) to purchase personal property consisting of jewelry, art objects and antiques, expensive automobiles, a houseboat and a motor yacht,[7] possession of which was taken for the most part by Smallwood, bankrupt's president, and Lay, its vice-president; (2) to purchase eight parcels of real estate, title to which was taken in persons other than the bankrupt;[8] and to provide for Smallwood, Lay, Conell, or members of their families, items or services in the nature of household furnishings, improvements to real estate, medical expenses, expenses to maintain boats and *82 motor vehicles, and recreation, travel and entertainment expenses.[9]
Additionally, monies were withdrawn by check from bankrupt's checking account in the North County Bank & Trust Company which cannot be traced into specific properties.[10] During the tax years in question, the total of the monies withdrawn by check from the account, and the total of the monies withdrawn by checks issued by Smallwood and payable to cash, are as follows:

 Withdrawn
 by checks
 Total Payable
Year Withdrawn to Cash 
1965 $ 43,864.23 $ 2,800.00
1966 561,944.89 44,363.32
1967 1,561,066.69 438,203.97
1968 3,807,972.54 757,192.93

Included in the checks issued by Smallwood, payable to cash, in 1968, are six checks totaling $190,000, the proceeds of which were paid to Smallwood primarily in currency of $50 and $100 denominations.[11] These checks were issued on the following dates, in the sums as shown:

 6-25-68 $ 5,000
11-15-68 30,000
12-5-68 30,000
12-12-68 50,000
12-13-68 25,000
12-13-68 50,000

As each sum was received by the bankrupt from one of its lenders, the bankrupt issued its promissory note to the lender. The lenders-noteholders considered their initial transactions with the bankrupt, by which they transferred money to the bankrupt in consideration for the issuance to them of promissory notes, as loan transactions, and intended that the monies so transferred be repaid, along with the promised interest, as promised in the notes. Exhibit 2-B attached to the parties' Stipulation of Facts is typical of the form of such notes, although the rate of interest varied as pointed out previously. The note reads:
"16,850.00 Feb. 1967
on or before after date 2-15-68 promise to pay to the order of Arthur and/or Loney Newton sixteen thousand eight hundred fifty ..... Dollars For value received negotiable and payable without defalcation, or discount and with interest from 2-15-67 at the rate of 100% percent and if the interest be not paid annually to become as principal and bear the same rate of interest.
 Diversified Brokers Co.
 9953 Lewis & Clark Blvd.
Payable at Maturity /s/ Harold F. Conell
No. X6508 Due Feb. 15, 1968 Exec. Secy. "
Prior to the maturity date of each such note, the noteholder was contacted either by the office of the bankrupt or by its field representatives and advised that his note was about to mature. At that time, the noteholder was given a statement of his account, which *83 reflected the amount he had loaned to the bankrupt and the interest which had accrued. The noteholder was advised that he had an option to redeem the note, i. e. be repaid the amount of the loan plus interest to the maturity date, or at the noteholder's election, to accept a new note (renewal note) in a face amount which included the principal plus accrued interest, payable on the same terms as the original note. Noteholders frequently opted to receive the accrued interest only. In such event, the face amount of the new (renewal) note would be the amount of the principal originally loaned to the bankrupt. Neither the bankrupt's officers nor its representatives coerced or compelled noteholders not to redeem their notes; nor were the noteholders coerced or compelled not to request the accrued interest. Neither the full redemption of the note nor a request for the payment of accrued interest was refused by the bankrupt. Whether a payment was received or not, noteholders, upon the respective maturities of their notes, continued to consider their transactions with the bankrupt as loan transactions.
During its existence, the bankrupt paid its noteholders the following amounts of money:

Year Principal Interest Total
1965 $ 5,400.00 $ 4,872.00 $ 10,272.00
1966 92,520.00 71,107.10 163,627.10
1967 225,658.13 397,532.55 623,190.68
1968 652,946.94 1,221,600.64 1,874,547.58
1969[*] 110,598.75 225,589.94 336,188.69
Total $1,087,123.82 $1,920,702.23 $3,007,826.05

These payments were made by check, drawn upon one of the checking accounts standing in the name of the bankrupt. Such accounts were maintained, during the tax years involved, in the North County Bank & Trust Company, and in the First Northwest Bank. Smallwood was the only person authorized to sign checks on behalf of the bankrupt, and all checks issued by the bankrupt were signed by him. In addition to the payments theretofore described, bankrupt's checks representing principal of $37,950.00, and interest of $45,369.00, thus totaling $83,319.00, were issued payable to noteholders. These checks did not clear the bankrupt's checking account because of the institution of receivership proceedings against the bankrupt and because of the issuance of injunction orders in that proceeding.
On February 17, 1969, the Securities & Exchange Commission filed a complaint in the District Court for this District against the bankrupt and its officers, charging violations of the Securities Act of 1933. On February 27, 1969, an order was entered in that cause restraining the bankrupt from further transacting business, and appointing a Receiver. The Receiver recovered the total sum of $1,551,453.67 from three banks, such total sum representing the sums on deposit to the bankrupt's credit in three demand checking accounts as of February 27, 1969.
At the close of each of the tax years involved, the bankrupt had the following sums on deposit to its credit in its checking accounts, and owed as principal to its noteholders (exclusive of interest) the following sums:

 Due
Year Bank Balances Noteholders 
1965 $ 3,963.72 $ 41,527.95
1966 57,492.07 591,709.99
1967 422,566.86 2,238,254.78
1968 1,170,934.97 6,154,519.01

2,895 claims have been filed by note-holders against this bankruptcy estate. Such claims have been filed for a total of $12,292,996.14, of which the aggregate principal due such noteholders as of February 17, 1969, is $4,374,572.18. The total outstanding debts of the bankrupt, on account of unpaid wages, for debts due trade creditors, and for unpaid withholding and social security taxes due the United States, as of February 17, 1969, amounted to $12,010.15. As of March 31, 1972, the last day embraced by the trustee's last filed report, the trustee in bankruptcy had in his trust estate $2,850,680.09 in two checking accounts and *84 in certificates of deposit. In addition, the trustee holds title to one parcel of real estate, and to one deed of trust, with an aggregate value of approximately $25,000; has asserted a claim to $15,000 in the registry of this Court; is attempting to recover the present value (approximately $50,000) of bearer bonds issued to Smallwood and his wife (said bonds having been "lost" or "misplaced" by the Smallwoods, and not to mature until 1978); and has asserted other claims which are now pending. Unless a cache is discovered, there will not be sufficient funds in this bankruptcy estate to pay the principal due noteholders who have filed claims against this estate.
The bankrupt did not file federal corporate income tax returns for any of the years here involved. During each of the tax years involved, there was deposited in checking accounts standing in the name of the bankrupt the following sums:

 Year Total Amount
 1965 $ 46,927.95
 1966 584,523.24
 1967 1,923,002.72
 1968 4,370,528.45

The Government bases its Claim No. 6 upon these bank deposits, claiming that the receipts manifested by such deposits constitute gross taxable income. (These amounts do not include deposits, in 1968, of $206,280.67, to a checking account standing in the name of the bankrupt in the First Northwest Bank.) Payments, whether as payments of principal or interest, to noteholders have been treated by the Government as expense deductions or deductions from gross income.[12]
On April 22, 1969, the bankrupt was adjudicated a bankrupt upon an involuntary petition filed in the United States District Court for this District. In that same month, Smallwood, Lay and Conell were indicted by the United States, and charged with eleven violations of the Securities Act of 1933 and with ten counts of mail fraud. Smallwood and Lay were convicted of all 15 counts submitted to the juryseven counts of securities fraud in violation of 15 U.S.C. § 77q(a), seven counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of mailing an unregistered security in violation of 15 U.S.C. § 77e(a)(2). Conell was found guilty on one count, charging a violation of 15 U.S.C. § 77e (a)(2). Smallwood was sentenced to 35 years imprisonment, Lay to twenty years imprisonment, and Conell to five years imprisonment. The convictions were affirmed on appeal. United States v. Smallwood (8 Cir., 1971) 443 F.2d 535, cert. den. 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93.
The books and records kept by the bankrupt consist of a cash disbursement journal, check stubs, canceled checks, invoices for purchases, receipted paid bills, and records which reflect the names of the noteholders, the principal amounts of their notes, and the accrued interest thereupon, the maturity dates of the notes, and copies of statements of account furnished to the noteholders reflecting the status of their loans. Bankrupt did not maintain any formal set of books reflecting income and expenses.
Unquestionably, as these facts show, the bankrupt was the borrower in a Ponzi-scheme,[13] by which money was borrowed by it, from unsuspecting lenders, upon false representations as to its business activity and upon false representations as to its ability to repay the borrowed monies plus interest at the promised rates. Because of the success of its scheme, the bankrupt could not at any time during its existence actually satisfy its outstanding obligations as manifested by the promissory notes issued by it to its lenders.
The issue is whether the bankrupt's receipts of moneys from its unsuspecting lenders under such circumstances constitutes gross income within the meaning of Section 61(a) of the Internal *85 Revenue Code, Section 61(a), 26 U.S.C.[14]
Section 61, as earlier "gross income" definition statutes, is said to be a manifestation of Congressional purpose "to use the full measure of its taxing power" under the Sixteenth Amendment. James v. United States (1961) 366 U.S. 213, 218, 81 S.Ct. 1052, 6 L.Ed.2d 246, 253. Nevertheless, the proper labeling for income tax purposes of ill-gotten gains, so called, has long vexed the federal courts. Compare James v. United States, supra, and Rutkin v. United States (1952) 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, with Commissioner of Internal Revenue v. Wilcox (1946) 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752.
It is said that these cases reflect that the Supreme Court has now firmly concluded that the economic benefit accruing to a taxpayer from a receipt of money is the controlling factor in determining whether the receipt is "income". United States v. Rochelle (5 Cir., 1967) 384 F.2d 748, 751, cert. den. 39 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135. This is said to be manifested by the Court in Rutkin, supra, where it is stated:
"An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678, [53 S.Ct. 761, 764, 77 L.Ed. 1439]; Corliss v. Bowers, 281 U.S. 376, 378, [50 S.Ct. 336, 337, 74 L.Ed. 916]. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it." 343 U.S. loc cit 137, 72 S.Ct. loc cit 575.
Literal application of this so-called "economic benefit" doctrine proves to be illusory however, in that not every receipt of money from which readily realizable economic benefit is derived by the recipient is taxable: for example, donees are not income-taxable on their gifts, and finders are not income-taxable on their finds. Loans, too, are excepted from the application of the doctrine. As stated in James v. United States, supra, 366 U.S. loc cit 219, 81 S.Ct. loc cit 1055
"When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, `he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' North American Oil v. Burnet, supra [286 U.S.] at p. 424 [52 S.Ct. at page 615]. In such case, the taxpayer has `actual command over the property taxedthe actual benefit for which the tax is paid,' Corliss v. Bowers, supra. This standard brings wrongful appropriations within the broad sweep of `gross income'; it excludes loans." (emphasis supplied)
So far as I have been able to discern, the Supreme Court has not in the context of the factual situation before this Court, taught us when a particular transaction is or is not a loan; nor when a taxpayer has or has not consensually recognized an obligation to repay. Certainly neither James' embezzled receipts nor Rutkin's extorted receipts were obtained upon any consensual recognition of an obligation to repay. See In re J. V. Gleason Co. (8 Cir., 1971) 452 F.2d 1219, 1222.[15] None of their receipts was *86 the result of a transfer of money made by a transferor who intended to be repaid.[16]
The Government contends, and its Claim No. 6 is based upon the theory, that a loan is not to be considered a loan, for income tax purposes, where the circumstances surrounding the receipt-transaction reflect that the borrower could not repay and, thus, is said not to intend to repay. This the Government contends even though it concedes that bankrupt's transactions with its lenders or noteholders not only take the form of loan transactions but, also, were considered by both parties to the transactions as a loan. The parties' intentions, it is argued in substance, are to be ignored because bankrupt's recognition of the transactions as loans, its agreement to repay, and its payments to its noteholders, all were parts of the scheme: a scheme which by its nature meant the greater its success the less able to repay its borrower became. Thus, the Government says, a loan which is a loan is not a loan for income tax purposes if it constitutes an integral part of a scheme by which a fraud is perpetrated upon the lender, and which, by reason of the success of the scheme, did not permit its borrower to repay.
The authorities cited to support such contention fall generally in two categories. In the first are cases such as Commissioner v. Makransky (3 Cir., 1963) 321 F.2d 598; Spheeris v. Commissioner (7 Cir., 1960) 284 F.2d 928; Clark v. Commissioner (9 Cir., 1959) 266 F.2d 698, 700, 711; Regensburg v. Commissioner (2 Cir., 1944) 144 F.2d 41, cert. den. 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625; Wiese v. Commissioner (8 Cir., 1938) 93 F.2d 921. This type of case is not authority here. These are insider cases, so called, where the recipient is a controlling or dominant officer or stock-holder of the purported lender corporation, and where the issue to be determined is whether in fact the transaction between the two is a loan transaction. In such cases, circumstances surrounding the transaction are objectively considered, in order to determine the purported borrower's intention to repay because his intention, because of his influence or control over the corporate lender, is simultaneously evidence and proof of the intention of the purported lender as well.
Such factual determination need not be made, here, as the evidence clearly shows that the bankrupt's lenders considered their separate transactions with the bankrupt as loan transactions, and the bankrupt, as conceded by the Government, considered such transactions as loan transactions, recognizing in each instance an obligation to repay its lender by the issuance and delivery of its promissory notes containing an unconditional promise to repay.
In the second category are United States v. Rochelle (5 Cir., 1967) 384 F.2d 748, cert. den. 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135; In re Home and Mortgage Corp. et al, No. B-189-67, D.C., N.J., 1971, unreported decision[17] of October 4, 1971; and Sidney W. Fairchild v. C. I. R. (1970) T.C. Memo 1970-329, 29 T.C.M. 1505.
The Rochelle case, supra, deserves something more than passing consideration inasmuch as the Government principally relies upon its holding to support its Claim No. 6 and because the taxpayer's activity there is similar, in certain respects, to the activity of bankrupt's officers, here. In Rochelle, the *87 Government filed a proof of income tax lien claim, based upon an assessment, and an accompanying lien and levy, of income taxes for 1959, in the sum of $124,485.24, against one Addison, the bankrupt in the Addison bankruptcy proceeding. The assessment was based upon the treatment of Addison's receipts from lenders as income to him, where he received such receipts as the result of fraudulent representations as to business ventures (which were non-existent), as to the ownership and control of certain uranium mines and land alleged to be replete with mineral and timber reserves, and as to the financial backing of him by the Clint Murcheson family and the financial interest in his activity by Merrill, Lynch, Pierce, Fenner and Beane. The tax-lien claim was denied by the Referee in Bankruptcy, and his decision was affirmed on review by the District Court. On appeal, the 5th Circuit reversed, and remanded the proceedings, ordering the claim to be allowed.[18]
The Court branded Addison's transactions with his lenders, although in the form of loans,[19] not as loans at all but as a fraud to acquire money from innocent third parties. The Court, pointing out that Addison treated the funds provided by these loans as belonging to him and to his associates without restriction, pointing out that such funds constituted the sole source of income to him and his associates, and pointing out that they lived lavishly on the funds, concluded that Addison was merely a purported borrower of money which he falsely promised to return, and stated (384 F.2d loc cit 751)
"A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra, 366 U.S. at 219, 81 S.Ct. at 1055. Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a `wrongful appropriation [and comes] within the broad sweep of "gross income"'. Ibid.
"We perceive no qualitative difference with regard to taxability between the gains of an extortionist, held taxable in Rutkin, those of an embezzler, held taxable in James, and those derived by a confidence man like Addison. The extortionist uses coercion, the embezzler stealth, and the confidence man false promises. All are legally under an obligation to repay their ill-gotten gains. All are guilty of crimes under the laws of the various states."
Continuing, after quoting from Rutkin v. United States, supra, the Court said (384 F.2d loc cit 752):
"While it is true that the lenders in this case would appear to have a claim against Addison for repayment of their loan, this is not relevant to the question of their taxability to Addison. Were we to hold otherwise, confidence men could avoid the tax consequences of their transactions by merely adding a false promise to repay to their other representations. Such a distinction between fraudulently obtained `loans' and fraudulently obtained outright grants is not tenable here."
It is manifest that the Rochelle court felt compelled to its conclusion because Addison derived the economic benefit from the monies received from his lenders, monies he received with no intention *88 to repay. Here, as the trustee points out in his brief, the bankrupt did not derive any such real benefit from monies received by it from its lenders. The bankrupt was utilized, principally by Smallwood, its president, as a repository for such monies, and as a conduit through which monies were made available to him and its other officers for misappropriation. The real economic benefit of monies[20] received by the bankrupt from its lenders was derived by Smallwood and other officers of the bankrupt. The record is replete with the form the misappropriations took.
Moreover, the bankrupt was utilized by Smallwood and its other officers as a shield and insulation from personal liability upon the notes to the noteholders, liability which is unconditioned and which was recognized by the bankrupt's payment of a total sum in excess 3 million dollars to its lenders during its active existence. In the face of such liability, having received no real economic benefit from the loans, such receipts ought not to be considered as gross income.
Further, the Rochelle court concluded, upon its record, that, Addison falsely promised to repay his lenders.[21] Bankrupt's promises, here, as the evidence discloses, were not such false promises in many instances. As stated, it paid out to its lenders a sum in excess of 3 million dollars during its existence. A sum in excess of 1½ million dollars reposed in its bank accounts at the time of the receivership, apparently available, certainly, in part, for payment to those of its lenders who may thereafter have requested payment.[22] Further, as the evidence here shows, a request by a lender for the return of principal and interest, or of interest, was not ever refused by the bankrupt.
I am not prepared under such circumstances where, as here, the bankrupt and its lenders intended that the monies received by the bankrupt from them be considered as loans; where the bankrupt honored, whenever requested, a lender's request for repayment; and where the bankrupt did not receive any real economic benefit from the receipt of such moniesto hold that a loan is not a loan for income tax purposes, and disregard what the evidence discloses to be a consensual obligation to repay and a recognition of that obligation by both the borrower and the lender. Under such circumstances, it is unthinkable to tax the bankrupt on its "gain" of the borrowed monies and thereby substantially impair the lenders' chances of recovering their debts. (paraphrasing Justice Black, in James v. United States, supra, 366 U.S. loc cit 238, 239, 81 S.Ct. 1052.)
Justice Black, in his dissents in Rutkin and in James, suggests that the economic benefit doctrine was applied in those cases in order to broaden the power to punish for local crimes and to make local criminal activity more expensive. (Rutkin, 343 U.S. loc cit 140, 141, 72 S.Ct. 571; James, 366 U.S. loc cit 230, 81 S.Ct. 1052.) If so, Smallwood and other officers of the bankrupt who truly benefited from the scheme ought to be taxed, and not the bankrupt. See Harold Gradsky, T.C. Memo 1970-145 (June 8, 1970).
In re Home and Mortgage Corp. et al., supra, holds that monies obtained upon loans secured by fraudulent mortgages (forged signatures) constituted income to the bankrupt corporation, where nearly two-third's of all money paid out during the tax periods by the bankrupt went to one Genser, the moving force behind the bankrupt, and where such payments left the bankrupt without funds to pay *89 off the mortgages. The evidence, the Court concluded (reversing the Referee), demonstrated that the bankrupt corporation did not intend to repay the mortgage loans. Further concluding, the Court said that without such intention to repay the bankrupt was deemed to have not incurred any such obligation to pay and must be taxed on the economic benefits realized from the transaction. The Court cited, as its authority, Commissioner v. Makransky, supra [(3 Cir., 1963) 321 F.2d 598.]
For reasons previously given, I do not believe the Makransky case is authority here and believe further that the Home case is wrongly decided.
Sidney W. Fairchild v. C. I. R., supra, is like the Rochelle case, in that clearly the petitioner Fairchild enjoyed the economic benefit derived from the monies received from his lender, even though he had formed a multiple number of corporations or companies (of which he was the sole stockholder or sole proprietor) which allegedly performed the activity for which the loaned money was needed.

. . . . . .
Finally, the trustee argues that the monies deposited to the bankrupt's bank accounts were held in constructive trust by the bankrupt for its noteholders, and that all of the monies garnered by him, the trustee, now as assets of this estate, belong in equity to such noteholders as beneficiaries of the trust. This contention is ruled against the trustee.
As the Government points out in its Reply brief, the matter of the enforcement of such a trust, if any, by a particular noteholder as against all or any part of the trust assets is not relevant to the determination of the income-taxability of the bankrupt's receipts. If the doctrine of the Rochelle case were to be applied here, and a determination made that the bankrupt's receipts of money from its noteholders pursuant to the scheme described hereinbefore constitutes taxable income, Claim No. 6 would be required to be allowed. Payment of it, within the priority scheme embraced by Section 64 of the Bankruptcy Act, Sec. 104, Title 11 U.S.C., might be subverted by (theoretically) the enforcement of constructive trusts against the trust assets, but this in no way determines the allowability of the claim.

. . . . . .
For reasons hereinbefore given, a separate order is being entered this date denying Claim No. 6. Separate findings of fact and conclusions of law in addition to the findings and conclusions appearing in this Opinion will not be filed.
 (s) Robert E. Brauer
 Referee in Bankruptcy
NOTES
[1] The Proof of Claim dated May 2, 1969, was filed May 2, 1969, and is designated Claim No. 1-T on the Referee's Claim Register. Government's Exh. E is a true copy of the claim. The claim embraces Withholding Taxes Alleged to be due for the 4th Quarter 1968 and 1st Quarter 1969, and FUTA taxes for 1968.
[2] This scheme is to be described in detail later. It is described, as well, in United States v. Smallwood (8 Cir., 1971) 443 F.2d 535, loc. cit., 536, 537, cert. den. 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93.
[3] Betty Smallwood resigned as director in November, 1967. The record does not show that anyone was elected or appointed to serve as director upon the occurrence of this resignation.
[4] Exclusive of issuing checks for the purchase of real estate where title was taken by some person other than Smallwood, Lay or Conell, and where notes and deeds of trust were taken back, by Smallwood. These purchases are described in para. 32 of the parties' Stipulation of Facts, subpara's. a), 5), and c). These transactions, in substance, constitute loans also.
[5] Attached to the letter is a typed note: "This letter may be used if in any way serviceable to you and your investors."
[6] See para. 9, Stipulation of Facts, filed September 16, 1970. The Stipulation does not relate this sum to any particular year. This sum was received in the form of checks, which were either cashed by or deposited to the personal bank accounts of Smallwood and Lay.
[7] Bankrupt's checks totaling $284,449.82 were issued to purchase jewelry from Hess & Culbertson; its checks totaling $48,550.25 were issued to purchase jewelry from two other jewelers. Its checks totaling $446,269.79 were issued to Four Seasons Antique Shop to purchase art objects and antiques. In addition, bankrupt's president, Smallwood, purchased with cash other art objects and antiques during the tax years at prices totaling $281,000.00.
[8] Where title was taken by persons other than Smallwood, Lay, or their designated granteeso that bankrupt's payment really amounted to a loan to the title holderthe title holder's deed of trusts and secured notes invariably were payable to Smallwood or his wife.
[9] These items and services were paid for by the bankrupt, in addition to the payment of salaries to Smallwood, Lay and Conell, and in addition to loans made to Lay and Conell, as to which payments of principal or interest had not been made, at bankruptcy. The salaries and loans, referred to, are as stipulated in para's. 34 and 35 of the Stipulation of Facts.

During the tax years in question, corporate checks totaling $2,385,197.77 were issued for the benefit of the three officers and their families. This sum includes the sums referred to in footnote 7 and the sums expended to purchase real estate.
In cause 69C 72(2), pending in this District Court, the trustee, on June 21, 1972, obtained a judgment against Smallwood, for $1,692,517.45, and against his wife, for $66,526.13, on account of monies improperly diverted by them or otherwise owing to the bankrupt. (The judgment takes into account credits for the net amount of the proceeds of personal property and real estate reclaimed from the Smallwoods and administered upon in this bankruptcy estate.)
[10] It may be fairly concluded, however, that some of the cash withdrawals probably provided Smallwood with the cash necessary to pay $281,000 in cash for art objects and antiques, as referred to in footnote 7, supra.
[11] The receiver was paid $50,000 in currency by Smallwood upon his appointment in the receivership proceeding, referred to infra. The evidence does not disclose the manner in which such sum was diverted from the bankrupt nor the time during which it was accumulated.
[*] through February 17, 1969.
[12] As the "necessary expenses" of the scheme. See Moore v. United States (5 Cir., 1969) 412 F.2d 974, 977.
[13] See Cunningham, Trustee of Ponzi v. Brown (1924) 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873.
[14] Section 61. Gross income defined.

"(a) General definitionExcept as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items . . ."
[15] Holding that an equitable subrogation lien, arising or created by operation of law, is not a consensual security device. Similarly, the extortionist's obligation to repay his victim and the embezzler's obligation to repay, is created by law to prevent injustice and does not arise by reason of the consent of the parties nor by their intentions.
[16] Intention to lend and expectation of repayment are necessary to the existence of a loan. National Carbide Corp. v. CIR (1949) 336 U.S. 422, 435 (footnote 16), 69 S.Ct. 726, 733, 93 L.Ed. 799, 10 A.L.R. 2d 576.
[17] A copy of the decision has been supplied by Government's counsel to this Court and to trustee's counsel. That copy will be attached to this opinion. I am advised by Government's counsel that the decision was appealed to the 3rd Circuit on November 23, 1971. I have not been able to find in the reports any consideration as yet of that decision on appeal.
[18] Which had the effect of depleting entirely the assets of the bankruptcy estate, so that Addison's lenders, of whom most had filed claims, would get no return.
[19] It is clear that the Court treated Addison's transactions as loan transactions even though his lenders were told that they, by lending him money, were to become joint owners in his venture and would acquire a part interest in his enterprises from which handsome profits could be expected. See S. E. C. v. Addison et al (D.C.Tex., 1961) 194 F.Supp. 709, for a more complete description of Addison's activities.
[20] Such as were not in turn repaid to bankrupt's lenders and not turned over to the Receiver.
[21] The reported opinion, concerning Addison's activities, indicate that minimal payments were made to Addison's lenders.
[22] Payment of issued checks, for sums totaling $84,319.00, was stopped, by reason of orders entered in the SEC receivership proceeding.